**Amadore PORCELLA, a citizen of the Republic of Italy, Plaintiff-Appellant,**

v.

**TIME, INC., a New York corporation, Defendant-Appellee.**

**No. 13389.**

United States Court of Appeals Seventh Circuit.

Feb. 28, 1962.

C. A. Caplow, Rudolph A. Visalle, Paul M. Smith, Jr., Chicago, Ill., for plaintiff-appellant.

Don H. Reuben, Howard Ellis, George D. Newton, Jr., Chicago, Ill., Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., of counsel, for defendant-appellee.

Before SCHNACKENBERG, CASTLE and KILEY, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Amadore Porcella, a citizen of the Republic of Italy, plaintiff, appeals from a judgment of the district court granting the motion of Time, Inc., a New York corporation, defendant, dismissing plaintiff's cause at his costs, on the ground that his complaint fails to state a claim upon which relief may be granted.

The parties are in agreement that the substantive law of Illinois governs in this case.

■ According to his brief, plaintiff, an art expert, brought this action for libel against defendant, publisher of Life, a weekly magazine, to recover damages resulting from an article published in the issue of December 7, 1959, wherein allegedly libelous language concerning plaintiff in his professional capacity as an art expert imputed to him lack of skill and competence, as well as dishonesty, trickery and misconduct, to the injury and damage of plaintiff's reputation as an art expert.

The court ruled that the language is not libelous within the meaning of the innocent construction rule, and that the language complained of constituted fair comment.[1]

According to plaintiff, the article pertained to the discovery of certain paintings in California which were attributed to certain old masters by plaintiff in his capacity and profession as an art expert.

In the interest of complete accuracy we set forth the article:

### WHAT IS SO RARE AS A RARE FIND?

California produces the latest reasons for viewing "Old Masters" suspiciously.

The news item from California was a rarity even in that land of overnight fairy-tale fortunes. Ten paintings, owned by Italian immigrants in Pasadena, were said to be Old Masters worth millions of dollars—"the greatest art find of the century!" This was the latest of a long line of "fabulous discoveries" that have burst upon the art world in recent years. The California canvases had long been in the Naples family of Maria and Alfonso Follo. When Maria married

---

1. In this opinion, unless otherwise indicated, the word "article" refers to the alleged libelous article.

a GI, she brought them to her new home in Pasadena and tucked them away in a closet and under a bed.

A year ago Alfonso Follo, a TV repairman who had come to live with his sister, dropped in at the neighborhood electrical supply store of Charles and Jay di Renzo and invited them to come up and see the family paintings some time. The Di Renzos came, saw and promptly made a deal with the Follos to help sell the art. Their first step: to find an expert to identify the paintings. They telephoned one Amadore Porcella, an Italian who had just authenticated a Raphael in Chicago.

Hurrying out to Pasadena, Porcella took one ecstatic look at the paintings and pronounced them masterpieces. One, he said, was a long-lost painting (above) by the 17th Century Italian master, Caravaggio, and he valued it at more than $1 million. Porcella then called in his friend, Alexander Zlatoff-Mirsky, a Chicago art restorer, for some heavy work. After a few weeks of working with "powerful solvents," Zlatoff-Mirsky declared the paintings almost as good as new and ready for unveiling.

Shortly after the "masterpieces" were made public, ominous doubts began to gather about their authenticity. A Pasadena expert said he had seen the painttings several years ago and found them worthless. A New York scholar said the long-lost Caravaggio was known through authentic copies (opposite, top) and bore no resemblance to the Pasadena work. Finally an Italian priest disclosed that the Follos' so-called Caravaggio was in fact a copy of a minor 17th Century painting (center) which hangs in Naples. The California fairy tale was showing signs of being just that.

## BUSY TEAM AND ITS THRIVING OUTLET

Discovering a trove of valuable Old Masters would be a once-in-a-lifetime stroke of luck for most mortals. But Porcella and Zlatoff-Mirsky have, as one of their friends observed, a "remarkable talent" for it. Just in the course of the past year they have authenticated more than a dozen "masterpieces."

The pair's instinct for art showed up early. Porcella started out to be a painter in Rome. At the age of 17, he explains, he switched to art criticism. Around 1934 he worked briefly at the Vatican gallery (compiling a guidebook of the art collection). Since then he has written a number of books and "authenticated" innumerable paintings. Zlatoff-Mirsky worked as a painter in Russia until the 1930s when he migrated to Chicago and took up the more remunerative profession of restoring art.

In 1958 the two "experts" met for the first time in New York. Soon after, Porcella went to Chicago and settled down in Zlatoff-Mirsky's studio to inspect the paintings which the Russian was restoring. In a short time they identified "millions of dollars" worth of art, tagged with such top-drawer names as Leonardo da Vinci, Rembrandt and Raphael.

The dual role of source and thriving outlet for most of the team's discoveries is played by the Sheridan Art Galleries, a Chicago auction house which specializes in old and modern "masterpieces." For the past 20 years their highly prized consultant and art restorer has been none other than Zlatoff-Mirsky. Recently the gallery's reputation was slightly tarnished when two buyers proved that the paintings they bought there were fakes. The gallery refunded the complainants' money, later sold one of the paintings for an even higher price.

## THE INS AND OUTS OF AUTHENTICATING

Active as they are, Professor Porcella and his colleague Zlatoff-Mirsky have not cornered the art "discoveries" market. Rival authenticators continue to turn up, armed with new-found treasures and long-lost masterpieces. Some of them are reputable authorities. Others are "experts" with elusive or spurious credentials. Whatever their background, many authenticators seem to be in the business at least as much for love of money as love of art.

How much an authenticator makes depends generally on the importance of the painter's name and the authenticator's evaluation of the particular painting. An expert is inclined to charge more for recognizing a Leonardo than a Lastman. Often the price of authenticating a painting far exceeds the amount paid for the work. Porcella received $2,000 for authenticating a work that was bought for half that price (left). Professor Erik Larsen received $550 for certifying a painting that originally cost his client $20 (opposite).

To enhance their prestige and give validity to their judgment, authenticators often publish books or articles reproducing their "discoveries." But their talent for writing is apt to show up best in the flamboyant certificates they compose for their "masterpieces."

The more unscrupulous authenticators have found a bonanza in providing income tax outs. A buyer who pays $1,000 for an old painting may call upon an "expert" to evaluate his purchase. For a comfortable fee, the "expert" values the painting at many times its actual worth. The buyer then donates the painting to a museum or some other institution, thereby getting a sizable write-off on his income tax for his charitable donation.

So far in the U. S. there are no legal penalties for such dealings. The quasi experts are not held responsible for their authentications. The auction houses are not required to back up the authenticity of the works they sell. And with the art market currently enjoying its biggest boom, the flood of dubious "masterpieces," both old and new, is sure to continue.

Several photographs and printed explanations appeared with the article.[2]

These explanations (designated alphabetically) are:

(a) THE "DISCOVERY" in Pasadena was labeled Caravaggio's long-lost painting of Mary Magdalene by the Follos' so-called experts. Other well-known authorities say that the stiff figure and the murky landscape are unlike the art of Caravaggio.

(b) THE ORIGINAL from which the Pasadena painting was probably copied hangs in the art gallery of the Gerolomini Friars in Naples. It was not done by Caravaggio, according to Father Antonio Bellucci (above, talking to TV interviewer) but probably by an undistinguished contemporary name Gian Battista Caracciolo, who was called "Battistello." The work has hung in this gallery for 300 years. The subject of the Magdalene was popular with painters of the Baroque period.

(c) ALTHOUGH A COPY, this is what Caravaggio's still-lost Magdalene looked like. It was made by Dutch artist a few years after Caravaggio painted his picture. This is in Barcelona. Another copy made in 1612 by a Flemish artist, is in Marseilles.

(d) OWNERS OF "MASTERPIECES" are Alfonso Follo (second from right), his sister Maria and her husband Chester Hataburda (left). Here they talk to lawyer Lester Olson about their personal dispute with their partners, the di Renzos.

(e) DISPLAY of name artists at the Sheridan Art Galleries in Chicago is supervised by the director, Jack Shore (above). The paintings have been labeled as (right, from top) a "Poussin," "Rembrandt," and "Steen"; (center, from top) "Correggio," "Metsys" and a "Leonardo da Vinci" which is held by Shore.

(f) REPAIR SHOP for "masterpieces" is the studio of Alexander Zlatoff-Mirsky (right) who sports artist's beret when he is on the job. He is surrounded by paintings which he discovered and Porcella authenticated. They include a "Rubens" (left, middle), "El Greco" (left, bottom), "Van Dyck" (center).

(g) AUTHENTICATOR Amadore Porcella inspects a painting in his Rome apartment. In foreground are photographs of controversial paintings in Pasadena.

(h) COMPARISON of Pasadena painting which Porcella attributes to Luca Giordano with an authentic Giordano in Florence reveals few similarities, many striking differences. Pasadena picture (left), showing centaur carrying off Hercules' wife, seems based on Giordano's *Rape of Persephone* (detail, right). But ungainly poses, theatrical faces and claw-like hands in Pasadena work indicate it was done by an unskilled follower of the 17th Century master.

(i) AUCTION VICTIM, Richard Feigen, bought painting (right) which Sheridan Art Galleries attributed to modern

1. The question arises in this case as to what extent public comment may be made about plaintiff in the practice of his profession as an art expert, in the course of which, as he alleges in his complaint, he renders "expert counsel, advice, opinions, evaluations and authentications pertaining to paintings, drawings and related works of art, to art museums, art collectors, art dealers and persons possessing such works of art." Plaintiff claims "a reputation for professional skill, competency and proficiency as an art expert in the eyes of the public."

We know of no governmental control of this profession, or requirement that a diploma or other authorization from any seat of learning must have been held by plaintiff.

Certainly plaintiff would be entitled, as any other person would be, to redress against any false statements of fact maliciously published in regard to him. However, in his complaint, as explained in his brief, *ante* 1, plaintiff's denial of the truth of the statements in the article has been limited to those charging or implying that plaintiff is not a qualified and recognized art expert and those imputing to plaintiff, as an art expert, a lack of skill, competence and fitness, as well as dishonesty, trickery and misconduct.

It is these statements which plaintiff charges defendant "wilfully, recklessly and maliciously wrote, edited * * * published * * *".

In addition to plaintiff's own admission that he occupied a position in a public field, it is obvious that as an expert he was able in the appraising of works of art to not only have an effect upon the market for the paintings and the prices paid therefor, but he also was in a position to appraise art donated by patrons for charitable purposes, who thereby would be the beneficiaries of tax deductions under the tax laws of the United States. In the latter activity he was in a position to leave his imprint upon the federal government's collection of revenue from the public.

Our analysis of the alleged libelous article convinces us that, insofar as the complaint charged it to be false, it is an expression of the publisher's comments and opinions upon the activities of plaintiff as an art expert with a description of the entire setting in which he was active. It might well be characterized as a satirical recital by an author who made no effort to conceal his belief that there were some authenticators of paintings less reliable than others. The article, insofar as it offended plaintiff, merely expressed the author's opinion, rather than made a false statement of any fact. Plaintiff was engaged in a field which he admits (and even boasts) was in the public domain and, as such, he was subject to comment by the public press as to his

master, Paul Klee. Feigen, a Chicago art dealer, checked work with two Klee experts who identified it as a forgery. He then returned picture to the Sheridan galleries and got his money back.

(j) **BUYER** J. P. De Laney hired Porcella and Larsen to identify purchase. Porcella labeled it Giorgione; Larsen, a del Piombo. Others doubt both labels.

(k) **DISCOVERER** Maurice Goldblatt attributes latest "find" to Raphael's father, Giovanni Santi. Goldblatt has authenticated art for Sheridan galleries.

(l) **MEDIUM** was called into the act by Antonio Follo, brother of the Pasadena Follos, to give advice on his family's paintings. In a table-tipping session in Naples, medium (above, right) professed to have made contact with 18th Century prince. Prince said that the paintings are worth "millions of dollars."

(m) **BEAMING BENEFICIARIES** of an "art treasure" are children of Mr. and Mrs. Alex Schiffelbian Jr. of Center Moriches, N. Y., whose future education is partly tied to painting of Magdalene on wall. Schiffelbians bought painting in furniture shop in Northport for $20. They showed it to Professor Erik Larsen of Georgetown University who declared it was long-lost Van Dyck worth at least $15,000. Other experts reject his attribution—underlining the problems in this controversial field.

activities in that field.[3]   Certainly there are no facts alleged to even suggest any personal animus between him and defendant in this case.

Because of the public nature of plaintiff's activities and the controversial question as to the genuineness of the alleged work of old masters, it is for the court to decide whether the publication was reasonably capable of the meaning ascribed to it by plaintiff.   Kulesza v. Chicago Daily News, Inc., 311 Ill.App. 117, 125, 35 N.E.2d 517.

In Brewer v. Hearst Publishing Co., 185 F.2d 846, at 850 we said:

> "The publications in the instant case are fair comment and criticism on a matter of public interest and as such are not actionable.   The essential elements of fair comment in order to be deemed not actionable are:   (1) that the publication is an opinion;   (2) that it relates not to an individual but to his acts;   (3) that it is fair, namely that the reader can see the factual basis for the comment and draw his own conclusion;   and (4) that the publication relates to a matter of public interest."

■ 2.   Moreover, in the case at bar, we are required to apply the rule recognized in Illinois as the innocent construction rule.

As we said in Crosby v. Time, Inc., 254 F.2d 927, at 929:

> "The so-called innocent construction rule, that is, if language is capable of innocent construction it should be read and declared non-libelous, is

firmly established in Illinois.   La Grange Press v. Citizen Pub. Co., 252 Ill.App. 482, 485;  Dilling v. Illinois Publishing and Printing Co., 340 Ill.App. 303, 306, 91 N.E.2d 635;  Parmelee v. Hearst Pub. Co., Inc., 341 Ill.App. 339, 343, 93 N.E.2d 512;  Epton v. Vail, 2 Ill.App.2d 287, 119 N.E.2d 410.   In the latter case, the Court in dismissing a complaint stated (opinion not published):

> " 'The language must receive an innocent construction when susceptible of such interpretation and cannot by innuendo be extended beyond a reasonable construction.   [Citing cases.]' "

More recently, in John v. Tribune Company, Jan. 23, 1962, 181 N.E.2d 105, the Illinois Supreme Court said:

> "We further believe the language in defendant's articles is not libelous of plaintiff when the innocent construction rule is consulted.   That rule holds that the article is to be read as a whole and the words given their natural and obvious meaning, and requires that words allegedly libelous that are capable of being read innocently must be so read and declared nonactionable as a matter of law.   Although this court has not heretofore expressed the rule, it has been adopted and applied by our Appellate Courts and by Federal Courts sitting in Illinois. * * *"

We hold that the district court correctly ruled that the article is not libelous within the meaning of the innocent construction rule and that the language complained of constituted fair comment.

---

3.   In Dilling v. Illinois Publishing & Printing Co., 340 Ill.App. 303, 91 N.E.2d 635, 637, which was a libel action, the court said:

"According to the allegations of her complaint, plaintiff sought public support and patronage, thus inviting public criticism.   The fact that defendants were reporting and commenting on a matter of public interest appears from the complaint.   Hence, defendants' right of fair comment in a matter of public interest was properly presented for determination by their motion to dismiss, and it was unnecessary to plead this right as an affirmative defense.   Manifestly the executive committee of the California American Legion does not share plaintiff's views on Americanism.   In our view this expression of difference of opinion as reported in the article here complained of is not actionable *per se*."

For these reasons the judgment from which this appeal has been taken is affirmed.

Judgment affirmed.

KILEY, Circuit Judge (concurring).

I concur in the result reached in the majority opinion. My concurrence is confined to the adequate ground of the fair comment rule. I expressly refrain from joining in the application of the innocent construction rule as stated by the Illinois Supreme Court in John v. Tribune Company, 181 N.E.2d 105, decided January 23, 1962.