Sean M. McNALLY and Janet
McNally, Plaintiffs,

v.

James YARNALL and the Metropolitan
Museum of Art, Defendants.

No. 90 Civ. 3076 (RWS).

United States District Court,
S.D. New York.

May 8, 1991.

Stryker, Tams & Dill by Christopher W. Hyde, Kathleen J. Olear, Scott B. Stolbach, New York City, for plaintiffs.

Lord Day & Lord, Barrett Smith by John J. Loflin, M. Breeze McMennamin, of counsel, New York City, for defendants.

## OPINION

SWEET, District Judge.

Defendant the Metropolitan Museum of Art (the "Museum") has moved pursuant to Rule 56, Fed.R.Civ.P., for summary judgment of the claims brought against it by Sean and Janet McNally (the "McNallys") in their defamation action against the Museum and James Yarnall ("Yarnall"). For the reasons set forth below, the Museum's motion is granted in part and denied in part.

### The Parties

The McNallys are residents of the State of New Jersey, and, for the past fourteen years, have been engaged in the purchase and sale of the works of the artist John La Farge ("La Farge"). McNally is also currently writing a book on La Farge and the history of his works. The McNallys have offered certain of their art works for sale through the Graham Gallery in New York City and at an exhibition of La Farge works sponsored by the William Vareika Fine Arts Gallery ("Vareika") in Newport, Rhode Island. In the past several years, articles in *The New York Times* and in *The Los Angeles Times*, as well as Associated Press wire service stories have mentioned or quoted McNally on the subject of stained glass and notified the public of upcoming lectures by McNally on La Farge.

Yarnall is a resident of the District of Columbia. An art historian specializing in the works of La Farge, he holds Ph.D. and M.A. degrees in art history from the University of Chicago. Yarnall also has a B.S. Equivalent Certificate of Accomplishment in computer programming from the Graduate School of the U.S. Department of Agriculture in Washington, D.C. Yarnall operates a company called Museum Systems Enterprises ("MuSE") which provides computer database services to various museums.

The Museum is a not-for-profit corporation organized under the laws of the State of New York and located in Manhattan.

### Prior Proceedings

The McNallys commenced this defamation and tortious interference with business relations action in the United States District Court for the District of New Jersey on November 27, 1989. By order of April 23, 1990, the New Jersey District Court transferred the action to the Southern District of New York pursuant to 28 U.S.C. § 1406(a) in lieu of granting a motion by Yarnall, a resident of the District of Columbia, to dismiss as to him for lack of jurisdiction.

On August 2, 1990, the Museum filed its motion for summary judgment. The parties agreed to an adjournment of the motion until December 7, 1990 to accommodate the scheduling of discovery. A subsequent agreement adjourned the return date of the motion to February 11, 1991, when oral argument was heard. The motion was considered fully submitted as of that date.

### The Facts

#### John La Farge

La Farge was an American artist who lived from 1835 to 1910. He received world renown for his stained glass work, one of several media in which the artist worked.

### Yarnall's Employment

1. The Catalogue Raisonne

In 1985, Yarnall was selected to direct the publication of *The Catalogue Raisonne of the Works of John La Farge* (the "Catalogue Raisonne") to be published by Yale University Press. The late Henry La Farge, grandson of the artist, had started the Catalogue Raisonne as a compendium of all of La Farge's known works. From 1983 to 1985, Yarnall had assisted Henry La Farge with the Catalogue Raisonne. Assisting Yarnall in the compilation of the Catalogue Raisonne is Catherine Voorsanger ("Voorsanger"), a graduate student at the City University of New York, where

she is working on her doctoral dissertation on La Farge.

## 2. The Study Center

In 1985, the Museum began work on its plan to create the Henry R. Luce Center for the Study of American Art ("the Study Center"), which opened in December, 1988. The Museum's purpose in creating the Study Center was to facilitate and encourage art historical research by compiling in a computer data base the existing information relating to the Museum's various American Wing collections. The Study Center is open to members of the public as well as to Museum personnel.

In 1985, the Museum retained Yarnall to assist the Departments of American Art in coordinating the computerization of information concerning the American Wing collections. Pursuant to the terms of the contract with Yarnall into which the Museum entered in 1985 and each succeeding year through 1989, the Museum paid Yarnall on an hourly basis for hours actually worked, as determined by Yarnall, or, in the case of the 1989 contract, at the rate of $250 a day, not to exceed $5,000 in the aggregate. The Museum did not withhold taxes or social security contributions from Yarnall's compensation, and reported his income on IRS Form 1099. Yarnall did not receive the sick leave, vacation, health insurance or other fringe benefits due other Museum employees. The contracts described Yarnall's relationship to the Museum as that of an independent contractor.

Yarnall's duties pursuant to the contract included: (1) the implementation of a computer program developed for the Museum by another computer consultant; (2) working with the curators to develop a thesaurus of cataloguing terms to be used to retrieve information entered in to the computer database; (3) the processing of amplified and corrected catalogue information.

Pursuant to the contract, Yarnall was to confer weekly to review his progress with Lewis Sharp ("Sharp"), curator and the administrator of the American Wing as well as with Doreen Burke, associate curator of American Painting and Sculpture.

The Museum selected Yarnall for the Study Center project in part on the basis of his previous experience as coordinator of a similar database at the Office of Research Support of the National Museum of American Art, part of the Smithsonian Institution.

While working on the Study Center project, Yarnall set his own hours, commuting to the Museum from his home in Washington, D.C. for a two day stint each week. He also worked on the project at home. The Museum provided him with an office and telephone, as well as with the use of Museum stationery.

## 3. The Schwartz Grant

On January 25, 1989, Yarnall entered into another relationship with the Museum, that of a "Richard J. Schwartz Research Associate." Mr. and Mrs. Richard J. Schwartz (the "Schwartzes") are collectors of art and benefactors of the Museum. During the previous year, the Schwartzes provided the Museum with a $60,000 research grant for the purpose of enabling Yarnall and Voorsanger to continue their work on Volume II of the Catalogue Raisonne. At the Schwartzes' request, none of the funds was allocated to cover the Museum's overhead or other administrative expenses.

Most of the terms of the contract were identical to the terms of Yarnall's Study Center contracts, with the exception that Yarnall's work under the Schwartz grant was described as follows:

> During the contract period, it is expected that you will research the murals of John La Farge executed between 1875 and 1910, as well as stained glass executed between 1886 and 1910. This research is in preparation for your contribution to the Catalogue Raisonne of the Work of John La Farge, to be published by Yale University Press, which will be dedicated to La Farge's work in all media.

Yarnall's compensation under the Schwartz grant differed from his compensation under the Study Center contract. Under the Schwartz grant, Yarnall was to

receive a total of $15,000 over the contract period, with $5,000 to be paid upon the signing of the contract, $5,000 to be paid on May 1, 1989, and the balance to be paid on September 1, 1989. Yarnall received these amounts without deductions for income taxes or social security contributions.

In a letter of January 25, 1990, the Museum renewed its contract with Yarnall relating to the Schwartz Grant for a further six month period ending June 30, 1990. Pursuant to the renewal, Yarnall received $5,000 upon signing and $5,000 on May 1, 1990, without deductions for taxes or social security contributions.

*Yarnall's Alleged Statements*

1. The Moon Window

In early 1988, Richard J. Schwartz ("Schwartz") told the Museum that he was interested in acquiring a stained glass window by La Farge. Alice Frelinghuysen ("Frelinghuysen"), the associate curator in the Museum's department of American Decorative Arts, asked Yarnall if he knew about any La Farge windows on the market, and Yarnall responded that such a window (the "Moon Window") by La Farge was for sale. Frelinghuysen relayed this information to Schwartz.

Schwartz asked Frelinghuysen and Sharp to attend a viewing of the Moon Window at the Museum. The Museum often accommodates such requests from benefactors to review works of art, but it is the Museum's policy not to render an opinion involving a valuation of such works.

Present at the viewing in the office of John K. Howat ("Howat"), the Lawrence A. Fleischman Chairman of the Departments of American Art, were Schwartz, Frelinghuysen, Sharp, as well as Yarnall and Voorsanger, whom Sharp and Frelinghuysen had invited to attend. Lawrence J. Zinsi ("Zinsi"), the owner of the window, and Vincent Mancuso ("Mancuso"), Zinsi's agent, waited in another room during the viewing.

During the viewing, there was a general discussion of the Moon Window, although Schwartz did not ask any one present for an opinion on the monetary value of the work. Yarnall stated his belief that based on a drawing of the window with which he was familiar, La Farge designed the window in the 1880's.

After the viewing, Schwartz conferred separately with Zinsi and Mancuso concerning the window's price. Schwartz did not talk about the price with Yarnall or with any one else except Zinsi. Schwartz subsequently bought the Moon Window for his personal collection for $165,000.

Some time before Schwartz's purchase of the Moon Window, McNally had an opportunity to view the window. McNally expressed the opinion that while the Moon Window was designed by La Farge, it is unlikely that La Farge himself executed the design. Based on this opinion, McNally valued the Moon Window at approximately $20,000.

Shortly after Schwartz's purchase of the Moon Window, a supposed "companion window" to the Moon Window sold at auction at Christie's for $14,200 (the "Christie's Window").

McNally believed that the Christie's Window was likely the companion to the Moon Window, based on dating, motif and execution.

Vareika offered the Christie's Window for sale at his 1989 La Farge exhibition in Newport, Rhode Island at a price of $150,-000.

2. The Garland Window

In late November, 1988, McNally consigned for sale to the Graham Gallery (the "Gallery") in Manhattan a stained glass window by La Farge known as "Garland of Fruit and Flowers" (the "Garland Window"). The asking price for the Garland Window was $150,000.

In early December 1988, Robin Graham ("Graham"), president and co-owner of the Gallery, contacted the Schwartzes and told them that the Garland Window was available for sale. The Schwartzes expressed interest in the Garland Window, and arranged to view it at the Gallery on December 5, 1988.

Schwartz asked Sharp, Frelinghuysen, Yarnall and Voorsanger to meet him at the Gallery of Robin Graham (the "Graham Gallery") to look at the Garland Window. Also present at the viewing was Cameron Shay ("Shay"), vice-president of the Gallery. Graham did not attend the viewing at the Gallery that day. Upon arrival at the Gallery, the visitors learned that McNally was the owner of the Garland Window.

After setting up the viewing room, Shay withdrew to the lower floor of the Gallery. During the course of the viewing Yarnall explained that La Farge created the Garland Window for the house of Cornelius Vanderbilt II. He then made several comments concerning the central area of the Garland Window. Yarnall stated that the window exhibited some fracturing and appeared to have been restored. He noted that some sort of glue or epoxy had been applied to the glass in such areas. A general discussion ensued, with the several viewers pointing to the areas where they detected such fracturing.

Schwartz did not purchase the Garland Window.

After Schwartz's viewing of the Garland Window, McNally asked several stained glass restorers and conservators as well as a restoration consultant to provide Graham with an explanation for the presence of epoxy on the Garland Window. The restorers sent Graham several letters detailing the process of "crizzling," the structural decomposition of glass that occurs with the diminution of the quantity of limestone in the glass over time. The letters stated that the application of epoxy to "seal" the glass is a technique for conserving glass once crizzling has set in. The restorer of the Garland Window also wrote a letter describing its restoration.

Graham forwarded copies of the letters to Frelinghuysen, who in turn showed them to Voorsanger. Frelinghuysen later met with Graham to discuss the contents of the letters, at which meeting Frelinghuysen told Graham to get in touch with Yarnall if he had any further questions about La Farge.

In early 1990 Schwartz purchased through the Gallery, another La Farge stained glass window owned by McNally. The window was virtually identical to the Garland Window.

## 3. The Newport Exhibition

In 1989 McNally and Vareika began planning an exhibition of La Farge works to be held in July 1989 in Newport, Rhode Island (the "Exhibition"). Of the approximately 117 works consigned to be sold through the Exhibition, 70 belonged to the McNallys.

On several occasions in the months leading up to the exhibit, Vareika sent to Yarnall for review photographs of many of the works that were to be included in the Exhibition. On each occasion, Yarnall rendered an opinion, usually over the telephone. The result of this exchange was that the works which he told Vareika were not in his opinion the works of La Farge were not included in the Exhibition or in catalogue listing these items (the "Exhibition Catalogue").

At some point during this time leading up to the Exhibition, McNally asked Vareika not to pass on to Yarnall photographs of the remainder of the items he planned to show in the Exhibition. Some of these works had been heretofore undiscovered, and McNally apparently wanted to introduce them in the book he planned to publish sometime after the Exhibition.

At some time early in 1989, Vareika asked Yarnall to participate in a symposium on La Farge to be held in Newport in conjunction with the symposium. In a letter of April 27, 1989 written on Museum stationery declining the invitation on the grounds of the demands of his schedule. In the same letter, he stated that he did not think that holding a symposium in order to publicize the Exhibition was "a good idea" on the grounds that any publicity to be gained would not justify the cost and on the grounds that a symposium, as opposed to a lecture series, by calling together people "who have a history of disagreeing with each other" would not serve adequately the goal of promoting the Exhibition.

### (a) The Rooster Window

In June 1989, Vareika placed an advertisement for the upcoming Exhibition in *Art and Antiques Magazine*. The ad contained, among other items, a photo of a stained glass window owned by the McNallys depicting a Rooster (the "Rooster Window"). The Rooster Window was not among the photographs previously sent to Yarnall. (Vareika dep. at 96, 98).

Whether in response to a conversation with Yarnall or in response to information from some other source, Vareika asked Yarnall for an opinion on the Rooster Window. Yarnall responded that the window was not recognized by La Farge by himself or by the Catalogue Raisonne. He told Vareika that Henry La Farge, the first director of the Catalogue Raisonne, had been the first person to reject the Rooster Window in 1984. Yarnall further stated that the rooster motif was unknown in La Farge's work and that the window was probably by Thomas Wright, La Farge's studio assistant.

Vareika then asked McNally his position on the authenticity of the Rooster Window. McNally repeated his position based on various factors that the Rooster Window was indeed a La Farge.

Vareika subsequently discontinued the ad and removed the Rooster Window from the Exhibition.

### (b) The Letter of August 4

On August 4, Yarnall wrote a letter to McNally on Catalogue Raisonne stationery which, along with accompanying documents, discussed the Rooster Window. The letter, which was not published to any one except McNally and Mary La Farge, the wife of the late Henry La Farge, reads in pertinent part:

> After Mary [La Farge] returns from the Adirondacks next week, she is going to write for elucidation on the works you own that are in Vareika's show, following upon earlier conversation with you. Surprisingly, many of these are not known to the catalogue raisonne, and not all of them seem to be by La Farge.

### (c) The Hollyhocks Window

The invitation to the Exhibition depicted a stained glass window owned by the McNally's known as the "Morgan Hollyhocks" (the "Hollyhocks Window"). The picture of the Hollyhock Window was captioned in the invitation as "Window originally from the J. Pierpont Morgan House, New York, New York."

In a telephone conversation shortly after Vareika issued the invitations, Yarnall told Vareika that in the opinion of the Catalogue Raisonne and in his opinion, there was no certainty that the window featured in the invitation was originally from the J. Pierpont Morgan House. He stated that his opinion was in part based on the fact that Henry La Farge had made a similar determination regarding the Hollyhocks Window in 1984, which communication Henry La Farge communicated to McNally in writing, as well as his knowledge of the provenance of the window.

Yarnall also stated that he had recently discovered another Hollyhocks Window and that he had good reason to believe that the newly discovered window was the window that had belonged to J. Pierpont Morgan. At Yarnall's deposition, he stated that he found out later that what he thought was the "real" Hollyhocks Window turned out to be a modern copy.

The parties dispute whether Vareika had solicited Yarnall's opinion on the Hollyhocks Window.

### (d) The Letter of August 19

On August 19, 1989, Yarnall wrote Vareika a letter, on Museum stationery, in connection with the Exhibition Catalogue. The letter states, in pertinent part:

> It has taken me some time to assess your catalogue, and my assessment is rather negative. The catalogue is filled with misinformation and misattributions.
>
> There are at least 20 (and perhaps more) works in the exhibition that simply aren't by La Farge. This is not news to you. I told you about many of these over the phone, and you said they would be listed as from La Farge's circle rather than

from his hand. I also note for the record that you misinformed me about the provenance of these pictures and this does make a difference. Initially, you told me that they all come from Heinigke/Leuchs—Heinigke of course being a recorded collector of lost La Farge portfolios from which such things might have come. Your catalogue, however, states that they came from the Thomas Wright House, quite a different story.

Since the early 1970's works owned by Thomas Wright at the time of his death have been recognized as largely by Thomas Wright—quite logically. Henry La Farge rejected a slew of works similar to those in the show that turned up in Thomas Wright's house at Montclair. Wright was a prolific artist, and did work quite independently from La Farge. I am in fact convinced that Sean [McNally] has the largest holdings of works by Thomas Wright in existence, but these do not belong in a La Farge show without clear qualification.

In any case, the following works are not at present considered to be by John La Farge: [Catalogue] Nos. 32, 44, 47, 49, 50, 51, 57, 58, 59, 66, 68, 69, 71, 72, 78, 83, 87 and 108. It's remotely possible that further study may admit one or two of these to La Farge's work, but it's certain that the vast majority will in the future be identified by us as the work of Thomas Wright or other La Farge assistants. We will be in touch with Sean [McNally] to tell him that these works are not by La Farge, and that they should not be represented as such in the future unless something major changes. On top of this, there are three works you say came from Wright (cat[alog] nos. 38, 47, and 84) that we know came from La Farge Estate Sale/Heinigke/Leuchs. It appears that Sean has the history of many works that he owns muddled, rendering anything that he says about them suspect.

... I simply fail to comprehend how that purported Garth James portrait got into the catalogue and exhibition without my knowing about it. I don't know if this is by La Farge or not, but the purpose of your tying up my phone and filling my mailbox with material that required immediate response was to assure that every object in the show was passed on by the catalogue [raisonne]. In view of how things turned out, I feel badly used.

... To avoid future problems, I will require of you the same thing that I require of everybody else: publishable 8 × 10 BW photos and complete, reliable provenance. All opinions will be rendered in writing so that there will be no misunderstanding.

Sincerely,
James L. Yarnall
Richard J. Schwartz
Research Associate
La Farge Stained Glass Project
and
Director
La Farge Catalogue Raisonne

## Discussion

### I. McNally's Allegations

McNally's defamation and tortious interference with business relations complaint is based on the following allegations: (1) that a rivalry between McNally and Yarnall had developed over the years: (2) that Yarnall's alleged valuation of the Moon Window at a price significantly above McNally's alleged valuation of the same window and above the price that an allegedly similar window received fanned this rivalry; (3) that at the viewing of the Garland Window, Yarnall stated that the window was not an "important work by La Farge, that it contained a significant amount of glass that was not original to the window, that it was obvious the window had been irreparably damaged and the glass badly shattered due to its having been dropped, and that it had been poorly restored"; (4) that Yarnall allegedly stated that the Garland Window was not worth $150,000; (5) with regard to the Exhibition, that Yarnall stated that the Rooster Window "was not recognized as a La Farge by either defendant Yarnall or the Catalogue Raisonne," that Yarnall made other false deprecating statements concerning the restoration of the Rooster Window,

that the Rooster motif was unknown in La Farge's work, and that the window was the work of Thomas Wright, not John La Farge; (6) that Yarnall defamed McNally to Vareika by stating that McNally was incompetent as a restorer of stained glass windows, and wrongfully repeated his remarks about the Rooster Window to Mary La Farge; (6) that Yarnall's letter of August 4 contained slanderous statements; (7) and that Yarnall's letter of August 19 commenting on the Exhibition Catalogue diminished the value of the McNally's work and called into question McNally's professional reputation by "asserting that anything which McNally stated with respect to the history or documentation of the art work owned by McNally was suspect."

## II. Summary Judgment Standard

 Under Rule 56, a motion for summary judgment shall be granted when the moving party demonstrates as a matter of law that he is entitled to that remedy because there are no genuine issues of material fact present in the action. *H.L. Hayden Co. v. Siemens Medical Systems, Inc.*, 879 F.2d 1005, 1011 (2d Cir.1989). The moving party, however, has the burden of demonstrating the absence of any genuine issue as to all the material facts, and the nonmoving party is entitled to all favorable inferences that may be drawn from the evidence. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444–45 (2d Cir.1980).

In support of its motion, the Museum submits that Yarnall's allegedly defamatory statements are not actionable as they fall within the protections of the Federal or New York State Constitutions, or, alternatively, because McNally is a limited purpose public figure, or because Yarnall's statements are subject to a qualified privilege for which malice must be shown. The Museum asserts that even if Yarnall's statements are defamatory, the Museum is not liable under the doctrine of *respondeat superior,* as an employer/employee relationship between the Museum and Yarnall does not exist.

In order to prevail on its summary judgment motion, then, the Museum must show the absence of any factual issue relating to Yarnall's status as an independent contractor, rather than an employee, of the Museum, or the absence of factual disputes relating to the privileged status of Yarnall's statements under any of the above listed theories.

## III. The Defamation Claim

### A. Absolute Privilege Based on the Federal or New York Constitutions

The McNallys' defamation claims are subject to whatever protection the First Amendment of the United States Constitution, as well as the New York Constitution, might provide. The level of protection provided by the U.S. Constitution to statement of opinion was the subject of a recent Supreme Court opinion, in which the Court held that the First Amendment contains no "wholesale defamation exemption for anything that might be labelled 'opinion'." *Milkovich v. Lorain Journal Co.,* — U.S. —, —, 110 S.Ct. 2695, at 2705, 111 L.Ed.2d 1, 17 (1990). In a recent opinion reconsidering a New York Court of Appeals case in light of *Milkovich,* however, the New York Court of Appeals stated that a separate and independent privilege exists under the New York State Constitution that is "often broader than the minimum required by the Federal Constitution." *Immuno, A.G. v. Moor Jankowski,* slip op. at 10, 77 N.Y.2d 235, 249, 566 N.Y.S.2d 906, 914, 567 N.E.2d 1270, 1278 (1991).

Under the holding in *Milkovich,* statements of opinion on matters of public concern are protected under the First Amendment as long as they do not contain a provably false factual connotation. *Milkovich,* 110 S.Ct. at 2706. Also protected under the First Amendment as interpreted by *Milkovich* are "statements that cannot reasonably be interpreted as stating actual facts about an individual." *Id.,* quoting *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 50, 108 S.Ct. 876, 879, 99 L.Ed.2d 41 (1988).

 Therefore, the question of whether the First Amendment protects Yarnall's

statements demands inquiry into whether (1) such statements address matters of public concern; (2) are expressed in a matter that is provably true or false; and (3) if so, whether they reasonably can be interpreted as intended to convey actual facts about a person.

The subject of Yarnall's alleged statements—the works of La Farge—is clearly a matter of public concern. Granted, the topic of La Farge may not be of interest to the population as a whole. Where, however, as here, the statements of Yarnall on the authenticity and value of works attributed to La Farge affect the market for and the tax implications of donating La Farge's works among the segment of the population that trades such works as well as the community of scholars with an interest in La Farge, such statements are of public import. *See Porcella v. Time, Inc.,* 300 F.2d 162 (7th Cir.1962) (allegedly defamatory nature of an article questioning the qualification, competence and honesty of an "art expert" who purported to render "expert counsel, advice, opinions, evaluation and authentications" of art works constitutes fair comment on a matter of public concern); *Don King Productions, Inc. v. Douglas,* 742 F.Supp. 778, 782 (S.D.N.Y. 1990) (while boxing matches do not arouse concern among some portions of the populace, boxing fans a sufficiently large and devoted segment of the public to warrant finding of public interest in comments of boxing promoter); *Immuno, A.G. v. Moor–Jankowski,* 74 N.Y.2d 548, 549 N.Y.S.2d 938, 549 N.E.2d 129 (Ct.App.1989), *vacated,* —— U.S. ——, 110 S.Ct. 3266, 111 L.Ed.2d 776 (1990), *adhered to,* 77 N.Y.2d 235, 566 N.Y.S.2d 906, 567 N.E.2d 1270 (1991) (letter to the editor published in scholarly journal directed to highly specialized group of readers relates to public controversy).

It is necessary therefore to consider whether any of Yarnall's statements are of a semantic form that either directly permits assessment of their truth or falsity, or that reasonably implies factually verifiable content. *Don King Productions,* 742 F.Supp. at 783. The plaintiffs, however, bear the burden of showing the falsity of defamatory factual assertions. *Philadel-* *phia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 776, 106 S.Ct. 1558, 1563–64, 89 L.Ed.2d 783 (1986); *Immuno, A.G. v. Moor–Jankowski, supra,* 74 N.Y.2d 548, 549 N.Y.S.2d 938, 549 N.E.2d 129 (1989).

### (a) The Garland Window

■ The first statements to be considered concern the Garland Window. The complaint alleges that Yarnall made statements about the importance of the work, the condition of the window, including its restoration, and the monetary value of the window. The affidavits and depositions of Schwartz, Frelinghuysen and Voorsanger, and the affidavit of Shay submitted in connection with this motion, show evidence that Yarnall made statements about the condition of the window, including its restoration, but not about the monetary worth of the window, and not about its importance within the general context of La Farge's work.

Viewing the evidence in the light most favorable to the plaintiff, and therefore assuming that Yarnall's statements on the condition of the window were similar to those alleged in the complaint, *i.e.,* that the window had been "irreparably damaged and the glass badly shattered due to its having been dropped" and that the window was "poorly restored," such statements might be capable of being proved false. For example, the McNallys have for the purposes of this motion submitted some evidence, in the form of letters by stained glass experts explaining the process of "crizzling," the deterioration of stained glass over time as well as on accepted methods for the arrest of this condition. Such condition could account for the fractured appearance of the glass, and could prove false Yarnall's alleged assertion that the glass had been shattered and poorly restored.

Assuming, however, that the above statements concerning the Garland Window are capable of being proved false, the McNallys, in order to recover damages for defamation under New York law, must make an additional showing that Yarnall acted with gross irresponsibility. *Post v. Regan,*

677 F.Supp. 203, 208 (S.D.N.Y.1988), *cert. denied*, 488 U.S. 1043, 109 S.Ct. 870, 102 L.Ed.2d 993 (1989) (applying, under New York law, standard of liability of gross irresponsibility for statements on matter of public concern); *Pollnow v. Poughkeepsie Newspapers, Inc.*, 107 A.D.2d 10, 486 N.Y. S.2d 11 (2d Dep't 1985), *aff'd*, 67 N.Y.2d 778, 501 N.Y.S.2d 17, 492 N.E.2d 125 (1986).[1]

Under the applicable standards, Yarnall did not act with gross irresponsibility in making the alleged statements that the glass had been shattered and poorly restored. In *Pollnow*, the court held that the defendant newspapers did not act with gross irresponsibility in publishing a letter to the editor without a thorough investigation of the statements contained therein. The court reasoned that a finding of gross irresponsibility in the case before it would deter newspapers from publishing letters to the editor, and important function of a newspaper. *Id.*, 486 N.Y.S.2d at 16 (citations omitted).

In the instant case, Yarnall is similarly not under an obligation to make an exhaustive investigation of the facts that establishes definitely that the window had been broken and restored before providing Schwartz with his opinion at an informal viewing. Holding Yarnall's conduct to be grossly irresponsible would unduly burden the important function of those who facilitate a contemplated transaction by providing on short notice an oral opinion on the quality of a work of art. Therefore, even if Yarnall's statements concerning the Garland Window are ultimately capable of being proved false, such statements were not made with the requisite gross irresponsibility to allow the award of damages.

### (b) The Rooster Window

■ The complaint alleges that Yarnall stated that the Rooster Window was "not recognized as a La Farge by Yarnall or by the Catalogue Raisonne"; that Yarnall stated that the Rooster motif was unknown in La Farge's work, and was instead the work of Thomas Wright; and that Yarnall made statements about the quality of the restoration of the Rooster Window, and about McNally's abilities as a restorer. The deposition of Vareika and the affidavit of Yarnall submitted for the purposes of this motion do not contain any evidence that Yarnall made any statement to Vareika about the quality of the restoration of the Rooster Window, or about McNally's abilities as a restorer. The McNallys submit no evidence of any statements made to Mary La Farge.

As to Yarnall's alleged statement that neither Yarnall nor the Catalogue Raisonne recognizes the Rooster Window, such statement is a proposition that cannot be disproved. The alleged statement refers to Yarnall's personal belief, and to the incontrovertible fact that the Rooster Window is not currently included in the Catalogue Raisonne.

Moreover, Yarnall has submitted evidence that his conversation with Vareika, which forms the basis for the allegedly defamatory statements concerning the authenticity and the condition of the Rooster Window, included reference to the basis for his belief that the Rooster Window was not a La Farge, first, that Henry La Farge did not recognize the Rooster Window as belonging to his grandfather, and second the type of glass in the Rooster Window was not of the type used by La Farge. Thus, Yarnall's statement concerning the authenticity of the Rooster Window was based on facts that were disclosed at the time of the statement. *See Steinhilber v. Alphonse*, 68 N.Y.2d 283, 290, 508 N.Y.S.2d 901, 904, 501 N.E.2d 550, 553 (1986) ("the essential task is to decide whether the words complained of, considered in the context of the entire communication and of the circumstances in which they were spoken or written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion.") (citing Restate-

---

**1.** New York courts have, moreover, distinguished the standards to be applied in determining gross irresponsibility for the purposes of the absolute privilege afforded matters of public concern from the standards used for determining malice for the purposes of a qualified privilege. *Pollnow*, 486 N.Y.S.2d at 15 n. 2.

ment [Second] of Torts § 566 comment c); *Immuno, A.G., supra,* 77 N.Y.2d 235, 566 N.Y.S.2d 906, 567 N.E.2d 1270 (1991) (in light of *Milkovich,* New York courts will continue to follow principle of taking into account full context of challenged speech, as set forth in *Steinhilber* ).

The McNallys, for their part, have not submitted any evidence to show that the Rooster Window is one of La Farge's works or that the rooster motif is a theme treated by La Farge in his work. Therefore, with respect to Yarnall's alleged statement arising from his conversation with Vareika concerning the Rooster Window, the McNallys have not raised an issue of fact as to the capability of these statements of being proved false. The statements concerning the Rooster Window thus enjoy the full protection of the New York State Constitution, and also the First Amendment, and are consequently not actionable.

#### (c) The Hollyhocks Window

The complaint alleges that Yarnall made certain statements denying the authenticity of the Hollyhocks Window. In a telephone conversation shortly after Vareika issued the invitations, Yarnall told Vareika that in the opinion of the Catalogue Raisonne and in his opinion, there was no certainty that the window featured in the invitation was originally from the J. Pierpont Morgan House.

The affidavits and depositions show that part of the basis for this opinion was Yarnall's knowledge of Henry La Farge's previous determination that the McNallys' Hollyhocks window was not the window belonging to J.P. Morgan, as well as his knowledge of the provenance of the window. Yarnall also stated that he based his opinion on his knowledge of another such window, which he thought could be the true Hollyhocks window from the J.P. Morgan House.

Yarnall's statement that in the opinion of the Catalogue Raisonne and in his opinion, there was no certainty that the window featured in the invitation was originally from the J. Pierpont Morgan House is sim-

ilarly not capable of being proved false. There will never be absolute certainty that the McNallys' window was from the J.P. Morgan House given the lack of signature on the window, and the existence of other windows featuring a Hollyhock motif. As with the Rooster Window above, moreover, Yarnall supported his statement with disclosed facts: Henry La Farge's earlier determination, and the provenance of the work. *See Steinhilber, supra,* 68 N.Y.2d at 290, 508 N.Y.S.2d at 904, 501 N.E.2d at 553.

Yarnall's statement that he was aware of a window which he considered to be the real Morgan Hollyhocks window—later proved incorrect—does not render false his earlier statements concerning the McNallys' window; the newly discovered knowledge that the second Hollyhocks window is a modern copy does not in itself prove the McNallys' window is the true Hollyhocks window, and therefore cannot disprove Yarnall's original statements about the window.

The McNallys, moreover, have not submitted any evidence that could show that their window is the one that belonged to J.P. Morgan. In sum, the McNallys have not raised a triable issue as to the falsity of Yarnall's allegedly defamatory statements concerning the Hollyhocks window. Therefore, the statements enjoy the full protection of the First Amendment or of the New York State constitution and are consequently not actionable.

#### (d) The Letter of August 4

The statements contained in the August 4 letter that "[s]urprisingly, many of these [works owned by McNally] are not known to the catalogue raisonne, and not all of them seem to be by La Farge" are similarly incapable of being proved false. The statements simply describe a set of facts pertaining to the catalogue at that particular point in time that no one would dispute. It is irrelevant that the McNallys would presumably dispute the accuracy of the catalogue. *See Don King Productions,* 742 F.Supp. at 784 (fact that boxer Mike Tyson ruled as "knocked out" by

referee "indisputably true" and nondefamatory of defendant).

### (e) The Letter of August 19

With respect to the letter of August 19, the complaint alleges that the letter called into question McNally's professional reputation by "asserting that anything which McNally stated with respect to the history or documentation of the art work owned by McNally was suspect."

In substance, the August 19 letter lists the works (all of them owned by McNally) by the Exhibition Catalogue number that "are not at present considered to be by John La Farge." Yarnall states the basis for these conclusions, namely, the provenance of these works (the house of Thomas Wright), and implicitly, the study of the catalogue, which has taken him "some time to assess." Therefore, with regard to the statements as to the authenticity of the works, Yarnall has supported his conclusions with disclosed facts. *See Steinhilber, supra,* 68 N.Y.2d at 290, 508 N.Y.S.2d at 904, 501 N.E.2d at 553.

■ The McNallys also allege to be defamatory two other statements by Yarnall in the August 19 letter. The McNallys contend that Yarnall's statement that "it's remotely possible that further study may admit one or two of these to La Farge's work" is defamatory in as much as the phrase "further study" implies that Yarnall had already engaged in considerable review of the disputed works. Whatever the implication of the phrase, and whatever the degree of attention Yarnall gave the disputed works in his review of the Exhibition Catalogue, such a statement is not actionable in this context as it does not target the character or performance of McNally. *See Don King Productions,* 742 F.Supp. at 784. The issue of the thoroughness of Yarnall's study of the disputed works goes to the issue of negligence, which in turn bears on the question of whether Yarnall's conduct was malicious. If, however, Yarnall's statements qualify for absolute protection under the Federal or New York Constitutions because they are incapable of

being proved false, then the court need not consider the issue of malice.

■ The final alleged instance of defamation is based on Yarnall's statement in his August 19 letter that "[i]t appears that Sean McNally has the history of many works he owns muddled, rendering anything he says about them suspect." Unlike the statement speculating whether further study will admit more of the disputed works to the corpus of those considered to be by La Farge, the statement that McNally has muddled the history of many of his works and that such works should therefore be considered suspect targets McNally's "character or performance." *Id.; Four Star Stage Lighting, Inc. v. Merrick,* 56 A.D.2d 767, 392 N.Y.S.2d 297 (1st Dept. 1977) (words affecting person in his professional capacity, trade or business by imputing incapacity, unfitness or want of any necessary qualifications are libelous).

Such a statement about McNally's professional competence as a dealer in La Farge works is, moreover, capable of being proved false. Furthermore, while Yarnall's other statements as to the authenticity of the objects submitted by McNally as La Farge works arguably call into question McNally's professional competence, such competence is a matter to be inferred by Yarnall's audience from his opinions as to the authenticity of the works. In contrast, the statements as to McNally's reliability as a dealer address directly McNally's competence.

### B. Qualified Privilege

■ Yarnall's statements that did not qualify for the absolute privilege under the Federal and the New York State Constitution may nonetheless be subject to the qualified privilege conferred by New York law for statements made in good faith on a subject matter in which the party making the statement has an interest or a duty, and in which the party about whom the statement is made has also a corresponding interest or duty. *Shapiro v. Health Ins. Plan of Greater New York,* 7 N.Y.2d 56, 60, 194 N.Y.S.2d 509, 512–13, 163 N.E.2d 333, 335–36 (1959).

■■ A showing of actual malice would, however, defeat such qualified privilege. *Id.,* 194 N.Y.S.2d at 512, 163 N.E.2d at 335. Malice is a question of fact for the jury if the plaintiff provides evidentiary facts—and not mere conclusory allegations—that the defendant was motivated by actual malice. *Friedman v. Ergin,* 110 A.D.2d 620, 621, 487 N.Y.S.2d 109, 110 (2d Dept.), *aff'd,* 66 N.Y.2d 645, 495 N.Y.S.2d 364, 485 N.E.2d 1029 (1985). Actual malice has been defined by the New York Court of Appeals as personal spite or ill will, or culpable recklessness or negligence. *Stillman v. Ford,* 22 N.Y.2d 48, 53, 290 N.Y. S.2d 893, 897, 238 N.E.2d 304, 306–07 (1968); *Hoeppner v. Dunkirk Printing Co.,* 254 N.Y. 95, 106, 172 N.E. 139, 142 (1930).

■■ Assuming the existence of a qualified privilege for the purposes of this motion, the McNallys have put forth some evidence from which malice may be inferred, thus raising an issue of fact as to the claim that Yarnall's statements enjoy a qualified privilege under New York law. The evidence concerning the valuation of the Moon Window, taken in the light most favorable to the plaintiff, establishes a professional rivalry between McNally and Yarnall, from which ill will might be inferred. The deposition testimony of Vareika and the evidence of the April 29, 1989 letter referring to the sharp disagreements among those invited to the La Farge symposium further support the existence of professional rivalry.

Moreover, the evidence relating to the care with which Yarnall examined the items in the Exhibition Catalogue, also raises a factual issue as to Yarnall's good faith. The evidence shows that Yarnall did not look at many of the works owned by McNally that he rejected as being true La Farges. The fact that it was McNally who withheld the photographs does not erase completely this evidence of recklessness or negligence for the purpose of showing actual malice where a knowledge of the potential effect of his statements on the value of the McNallys' collection could fairly be ascribed to Yarnall. Therefore, the Muse-

um cannot receive summary judgment on the remaining claim against it based on its argument that New York's qualified privilege protects Yarnall's statements.

### C. McNally as a Limited Purpose Public Figure

■ The Museum argues in the alternative that McNally is a limited purpose public figure and on this ground his alleged statements are not actionable. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In *Lerman v. Flynt Distributing Co.,* 745 F.2d 123 (2d Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985), the Second Circuit set forth a four part test to determine who is a limited purpose public figure:

A defendant must show that plaintiff has (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access the media.

*Lerman,* 745 F.2d at 136–37. Such a limited purpose public figure may still, however, receive damages where he makes a showing of malice. *Id.* at 136, citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

■ Assuming, *arguendo,* that McNally is a limited purpose public figure, he has nonetheless raised a factual issue as to the question of malice, for the reasons stated above. Therefore, the Museum cannot receive summary judgment on the remaining claim against it on the grounds that Yarnall's alleged statements fall within the privilege for statements made about a limited purpose public figure.

### D. Yarnall's Employment Status

■ Based on the discussion above, the only set of statements made by Yarnall that is not protected by the absolute privilege under the Federal or New York State Constitutions are the statements allegedly

made in the letter of August 19 referring to McNally's professional competence. Before such statements can be actionable against the Museum, however, it must be shown that Yarnall was acting as an employee of the Museum at the time of those statements.

The facts underlying the issue of Yarnall's employment status are not disputed; there is an issue only as to the conclusions to be drawn from those facts, and therefore Yarnall's status is a question appropriate for summary judgment. If the facts as stated require the legal conclusion that Yarnall was not an employee of the museum, but rather an independent contractor at the times relevant to the allegations stated in the complaint, then the Museum is not liable for any of his statements. *Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 253, 95 S.Ct. 465, 470–71, 42 L.Ed.2d 419 (1974); *Nelson v. Globe Internat'l, Inc.*, 626 F.Supp. 969, 977 (S.D.N.Y. 1986).

In a case involving the determination of employee status pursuant to the National Labor Relations Act, the Second Circuit discussed the factors to be considered in such a determination:

> whether the purported employee is engaged in a distinct occupation or business; whether the work involved is usually done under an employer's direction or by an unsupervised specialist; the skill involved; who supplies the instrumentalities and place of performance; the length of employment; the method of payment (by the time or by the job); whether the work is part of the employer's regular business and/or necessary to it; and the intent of the parties in creating the relationship.... *No single factor is determinative.*

*Hilton Internat'l Co. v. NRLB*, 690 F.2d 318, 320–21 (2d Cir.1982) (citations omitted) (emphasis added). Other factors are whether the employer withholds taxes or social security, whether the worker receives fringe benefits, and how the parties themselves view the relationship. *Nelson*, 626 F.Supp. at 978 (citations omitted).

Weighing the facts as they existed at the time of the alleged statements in the letter of August 19 requires the conclusion that Yarnall was not an employee of the Museum for the purposes of his correspondence with Vareika. At the time of the August 19 letter, Yarnall was working for the Museum both in his capacity as data base coordinator for the Study Center, and as Schwartz Associate. Yet few of the traditional indicia of employment obtained. The Museum did not withhold taxes or social security payments. Both contracts were for the performance of duties in which Yarnall had special skills. The intent of the parties, as stated in the contracts, was that Yarnall was an independent contractor.

Moreover, Vareika's acquaintance with Yarnall is completely independent of the Museum, dating back long before Yarnall's association with that institution. It hardly appears, then, that Vareika in asking Yarnall to approve the items to be included in the Exhibition was relying indirectly on Yarnall's relationship with the Museum as an endorsement of Yarnall.

Nor was Yarnall an employee of the Museum at any other time. Assuming that any of the statements made by Yarnall to Schwartz at the time of the viewing of the Garland Window were not absolutely protected, such statements would not be actionable as against the Museum where no such employer/employee relationship existed at the time of the statements.

At the time of the alleged statements concerning the Garland Window, Yarnall was working for the Museum solely in his capacity as data base coordinator for the Study Center, an occupation distinct from or at least subsidiary to the Museum's primary function of collecting and displaying works of art. As discussed above, Yarnall's contract with the Museum did not indicate an employee status so much as independent contractor status.

Moreover, Yarnall did not attend the viewing of the Garland Window as part of his duties under his contract with the Museum. Schwartz asked him to attend, and he came out of his own interest. Nor was

Schwartz under the belief that Yarnall was speaking for the Museum when he made the alleged defamatory statements. As the recent donor to the Museum of the grant which was to be used to fund Yarnall in his La Farge research, Schwartz was well aware of Yarnall's status.

The above discussion of the facts requires the finding that at no time relevant to the statements alleged in the complaint was Yarnall an employee of the Museum. This finding of no employer/employee relationship warrants summary judgment in favor of the Museum of the claims against the Museum based on the statements in the August 19 letter. The above findings with respect to Yarnall's employment status further require that even if Yarnall's other alleged statements are not absolutely privileged under the United States or New York State Constitutions, such claims are nonetheless not actionable as against the Museum.

IV. The Tortious Interference Claims

The McNallys' claims for tortious interference with contractual relations and prospective business relationships are based entirely on Yarnall's alleged statements. Therefore, the court's holdings on the defamation claims determine the tortious interference claims. *Stillman*, 22 N.Y.2d at 54 n. 3, 290 N.Y.S.2d at 897 n. 3, 238 N.E.2d at 307 n. 3.

*Conclusion*

For the reasons stated above, the Museum's summary judgment motion is granted, and all the claims alleged against the Museum are dismissed.

It is so ordered.