EDWARD CHALPIN, Appellant, v AMORDIAN PRESS, INC., Doing Business as MUSICIAN, PLAYER & LISTENER, et al., Respondents.

First Department, May 19, 1987

## APPEARANCES OF COUNSEL

*Morgan Kennedy* of counsel *(Ronald Skolar,* attorney), for appellant.

*Slade R. Metcalf* of counsel *(Squadron, Ellenoff, Plesent & Lehrer,* attorneys), for Amordian Press, respondent.

*Frank R. Curtis* of counsel *(Rembar & Curtis,* attorneys), for David Marsh, respondent.

## OPINION OF THE COURT

ELLERIN, J.

The issue in this defamation action is whether summary judgment directing dismissal of the complaint was properly granted in favor of both the author and the publisher of an article in which plaintiff alleges he was libeled.

Plaintiff Edward Chalpin is the owner of a recording studio and for over 20 years has managed many recording artists and published their songs and recordings. Defendant David Marsh, a free-lance journalist who has written extensively about the popular music field, is the author of the complained-of article entitled "Jimi Hendrix—the Voodoo Lives On"

which appeared in the October 1980 issue of Musician, Player and Listener, a small monthly magazine devoted to news and criticism of the music business that is published by the defendant Amordian Press, Inc.

The article described the meteoric career of rock musician Jimi Hendrix who became an "overnight success" in the summer of 1967 as a result of various events that coalesced during that period including an extraordinarily successful tour of England, a widely acclaimed appearance at the Monterrey Pops Festival, and the release, and immediate success, of his first single record (Purple Haze) and his first album (Are You Experienced). Hendrix thereafter enjoyed great popular acclaim until his untimely death in September 1970.

In October 1965, at a time prior to his achievement of popular success, Hendrix, then an unknown, signed a contract with plaintiff Chalpin's company, PPX Enterprises, Inc. Under the terms of the contract, PPX was granted exclusive rights to his services for a three-year period in exchange for $1, *plus 1% of the retail selling price of all records sold, and minimum scale for arrangements produced.*

Defendant Marsh asserts that the major theme of his article was that Hendrix was underestimated and misunderstood because during his brief period of success, before he died, he never had full control over his artistic career, being impeded by business and personal problems, many caused by "disadvantageous early business deals", including his dealings with plaintiff Chalpin. In that regard, the article contains the following passage: "No one asked about his business, not that Hendrix wasn't so befuddled on a lot of those points that his answers would have been coherent. To record as a sideman with Curtis Knight, *he'd been forced to sign a $1 contract with an unbelievably unscrupulous character named Ed Chalpin,* who later won two percent of his record royalties and the right to the *Band of Gypsies* live album in an out-of-court settlement because Hendrix's management controlled lawyers weren't willing to mount a substantial fight." (Emphasis added.)

Plaintiff claims not only that he was defamed by this reference but also that the facts, particularly with reference to his contract with Hendrix, are grossly misrepresented. Defendant Marsh asserts that his primary source for the facts of Hendrix' life and business dealings was an authoratative 500-page biography of Hendrix written by David Henderson

and published in 1978. Parenthetically, it may be noted that the Henderson biography includes a verbatim recital of the entire contents of the contract referred to in Marsh's article. Defendant Amordian, the publisher of the article here in issue, alleges that it relied exclusively upon the defendant author Marsh, as an experienced and reliable writer in the field, for the accuracy of the facts in his article.

There can be little question that the complained-of description of plaintiff as "an unbelievably unscrupulous character" is one that would, in terms of its impact upon the average reader, tend to hold him up to contempt, aversion or disgrace or " 'induce an evil opinion of him in the minds of right-thinking persons' ", and, therefore, would, if false, be libelous per se. *(See, Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 379, *cert denied* 434 US 969; *Silsdorf v Levine,* 59 NY2d 8.)*

Notwithstanding that the statement is defamatory, the determinant as to whether it may serve as the predicate for an action in damages rests upon the character of the statement— that is, whether it is one of fact or opinion, which is a threshold issue of law to be decided by the court. *(Rinaldi v Holt, Rinehart & Winston, supra,* at 381.) Determining whether particular words express fact or opinion is frequently fraught with difficulties stemming from the varying subjective perceptions engendered by language and extensive judicial analysis has been evoked in the search for a mechanism that will enable categorization of the elusive *(see, e.g., Ollman v Evans,* 750 F2d 970, where the 11-member court, sitting en banc, issued eight separate opinions directed toward that issue). However, the alleged defamatory statement here complained of, that plaintiff is "an unbelievably unscrupulous character", is the sort of subjective moral evaluation that readily falls within the ambit of what the average reader would understand to be the author's "opinion" rather than fact, and Special Term was correct in so characterizing it.

It is now well settled that an expression of pure opinion is not actionable because of the constitutional protection accorded to the expression of ideas, no matter how vituperative or unreasonable. *(Steinhilber v Alphonse,* 68 NY2d 283; *Rinaldi v Holt, Rinehart & Winston, supra.)*

The rationale for this immunity, as set forth in *Gertz v Robert Welch, Inc.* (418 US 323, 339-340) is that: "Under the First Amendment there is no such thing as a false idea.

However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas". Toward that end, a defamatory statement of opinion will be accorded complete immunity if it is either accompanied by a recitation of the facts upon which it is based, or, alternatively, if not so accompanied, does not imply that it is based upon undisclosed facts which justify the opinion but are unknown to those reading or hearing it. *(Steinhilber v Alphonse, supra.)* In the first instance, the presence of the factual predicate upon which the opinion rests ensures "that the reader has the opportunity to assess the basis upon which the opinion was reached in order to draw his own conclusions concerning its validity" and thus, even if those facts do not support the "opinion", no action will lie. *(Silsdorf v Levine,* 59 NY2d 8, 13-14, *supra.)* On the other hand, a bald statement of opinion, without more, bespeaks its subjective derivation.

When, however, a statement of opinion implies that it is based upon undisclosed facts which justify the opinion—that is, implying that the author knows certain facts, unknown to his audience, which support his opinion and are detrimental to the person about whom he is speaking—it is deemed a "mixed opinion" and is actionable. *(Steinhilber v Alphonse, supra,* at 289-290; *Rand v New York Times Co.,* 75 AD2d 417, 422; *see also, Hotchner v Castillo-Puche,* 551 F2d 910, 913, *cert denied sub nom. Hotchner v Doubleday & Co.,* 434 US 834.)

There is yet one further permutation of the fact/opinion dichotomy which commands attention, that is, where the derogatory statement of opinion gives the impression that it sets forth the facts upon which it is based, but those underlying facts are either falsely misrepresented or grossly distorted. This, too, is held to be a "mixed opinion" which is actionable *(Silsdorf v Levine, supra; Rand v New York Times Co., supra),* consistent with the recognition that there is no constitutional value in false statements of fact. "Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues" *(Gertz v Robert Welch, Inc., supra,* at 340, citing *New York Times Co. v Sullivan,* 376 US 254, 270).

It was this type of "mixed opinion" which was before the court in *Silsdorf v Levine (supra).* In that case, alleged defamatory statements of opinion, contained in a letter distributed in the course of a political campaign, were held sufficient to form the basis for a defamation claim in light of allegations by

plaintiff that facts set forth in such letter in support of the opinions were "gross distortions" and "misrepresentations of fact". Accordingly, the complaint, which had been dismissed for failure to state a cause of action, was reinstated to afford plaintiff the opportunity "to demonstrate the falsity of the letter's statements of fact and convince the triers of fact that the factual disparities would affect the conclusions drawn by the average reader regarding the validity of the opinions expressed". This holding is particularly relevant to the matter here at issue.

██ In the instant case, Special Term granted summary judgment in favor of both defendants and directed dismissal of the complaint because it found the alleged defamatory description of plaintiff as "an unbelievably unscrupulous character" to be a protected expression of opinion, but in so doing it failed to accord appropriate consideration to plaintiff's allegations as to the infirmity of the underlying facts set forth in support of that opinion. As in *Silsdorf (supra),* plaintiff here, too, claims that facts which were set forth in the article in support of defendant's defamatory opinion were false and distorted. He specifically points to the reference to the terms of his contract with Hendrix which are asserted to provide payment to the latter of only $1. From a reading of the contract itself, which is set forth in its entirety in the record, it appears that this statement is clearly a substantial and material misrepresentation of fact.

While the agreement commences with an introductory paragraph that includes the usual formalistic obeisance to traditional contract language by stating "[i]n consideration of the sum of one (1.00) dollar and other good and valuable consideration it is agreed to as follows", it thereafter expressly provides for payment to Hendrix of "one (1) per cent of retail selling price of all records sold for his production efforts" and also provides for "minimum scale for arrangements he produces". Clearly, these provisions would have resulted in substantial compensation to Hendrix, then an unknown, in the event of a hit record and they certainly could be construed as not limiting payment for his efforts to "$1" as stated in the article.

Moreover, the inference of unconscionability which emanates from a patently unfair "$1 contract" is further exacerbated in the article by the reference to Hendrix being "forced to sign" such agreement. His being "forced to sign" is accompanied by the implication that the author is privy to facts,

unknown to the reader, which are supportive of this conclusion and detrimental to the plaintiff.

The strained and convoluted construction which defendants seek to impute to the terms of the contract in order to justify the "$1 contract" statement of fact made in the article is wholly untenable in terms both of how the actual contract terms could be understood by the average musically involved reader of the magazine and how the contract has been legally interpreted in prior litigations *(see, e.g., Yameta Co. v Capitol Records,* 279 F Supp 582, 584, *revd on other grounds* 393 F2d 91), and is wholly insufficient to serve as a basis for summary judgment.

Defendants further seek to justify the omission of the terms of the contract by arguing that a 1% royalty was, in any event, grossly inadequate even for an unknown performer, an issue sharply contested by plaintiff. However, this would not insulate defendants from liability for materially misrepresenting the facts that were set forth in the article (as to the terms of the contract) for the reader's assessment of the basis for the author's opinion of Chalpin as "an unbelievably unscrupulous character". Once defendant Marsh undertook to provide a factual basis for his opinion, he was obliged to provide his readers with a reasonably accurate version of those facts, and in light of the issues here raised with respect to his failure to do so by way of misrepresentation, distortion and omission, it was inappropriate to grant summary judgment on the ground that his characterization of Chalpin was a protected expression of opinion.

That the papers here are sufficient to demonstrate that the article in question is susceptible of a defamatory interpretation does not, however, end the inquiry. Defamation is no longer, as was the case at common law, a strict liability tort. As currently shaped, within the framework of our contemporary recognition of the predominating importance to a free society of First Amendment protections, there can be no liability for defamation without "fault". The standard of fault which applies is dependent upon the status of the party defamed—that is, whether a public figure or private individual—and the setting within which the defamation takes place. *(Chapadeau v Utica Observer-Dispatch,* 38 NY2d 196.)

Where the plaintiff is a public official or a public figure, the standard of fault which must be established is that of "actual malice" as mandated by the decision in *New York Times Co. v*

*Sullivan* (376 US 254, *supra). In the case of a private individual, the emphasis is upon the content of the article within which the defamation appears and the controlling standard, as fashioned by the Court of Appeals in *Chapadeau (supra,* at 199) is that "where the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover; however, to warrant such recovery he must establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties."

In the instant case, we find that Special Term properly concluded that the *Chapadeau* standard should apply since the article is certainly one that is "arguably within the sphere of legitimate public concern". However, we reach a different conclusion with respect to whether the papers here are sufficient to defeat defendant Marsh's summary judgment motion on that issue. Marsh's allegations that he extensively utilized and relied upon David Henderson's biography for the facts of Hendrix' life and business dealings, and his acknowledgment that such biography contained a recitation of the complete contents of plaintiff's contract with Hendrix, are sufficient to create an issue as to whether Marsh acted in a grossly irresponsible manner by untruthfully characterizing and distorting the terms of that contract in his own article.

■ As to the defendant publisher Amordian, however, a different situation prevails on the "fault" issue. While the standard is the same—i.e., gross irresponsibility—it is applied with realistic recognition of the manner in which the publishing industry functions. Thus, once there is an unrebutted showing, as is here the case, that the publisher relied upon the integrity of a reputable author and had no substantial reason to question the accuracy of the information provided by such source, the publisher cannot be held responsible because that information is subsequently found to be false. *(See, Rinaldi v Holt, Rinehart & Winston, supra,* 42 NY2d, 382-383; *Ortiz v Valdescastilla,* 102 AD2d 513.)

■ With respect to the issue of damages, plaintiff alleges in his complaint that he has been injured in his good name and reputation and has suffered great pain and mental anguish and has been held up to ridicule and public contempt by his friends, acquaintances and the public, all to his damage in the

sum of $500,000. "These allegations sufficiently claim actual injuries and though they must be proved at trial * * * they need not be supported by affidavit proof on this summary judgment motion." *(Hogan v Herald Co.,* 84 AD2d 470, 481, *affd* 58 NY2d 630.)

Accordingly, we find that on papers herein, a sufficient showing has been made to warrant a trial on plaintiff's defamation action against defendant Marsh and summary judgment dismissing the complaint should be reversed and the complaint reinstated as to said defendant.

Appeal from an order, Supreme Court, New York County (Alfred Ascione, J.), entered August 14, 1985, which denied plaintiff's motion for summary judgment and granted the cross motions of defendants David Marsh and Amordian Press, Inc. for summary judgment dismissing the complaint, should be deemed an appeal from the judgment of the Supreme Court, New York County, entered October 16, 1985, implementing the order. The judgment, Supreme Court, New York County, entered October 16, 1985, should be modified, on the law, to reverse the grant of summary judgment to the defendant Marsh, to deny the motion and to reinstate the complaint as to said defendant, and otherwise affirmed, without costs.

Sandler, J. P., Ross and Kassal, JJ., concur.

Judgment, Supreme Court, New York County, entered on October 16, 1985, unanimously modified, on the law, to reverse the grant of summary judgment to the defendant Marsh, to deny the motion and to reinstate the complaint as to said defendant, and otherwise affirmed, without costs and without disbursements.