Elliot M. Gross, Appellant, v New York Times Company et al., Respondents.

First Department, June 16, 1992

## APPEARANCES OF COUNSEL

*Leon Segan* of counsel *(Howard M. Squadron* and *Joseph R. Gagliano, Jr.,* with him on the brief; *Segan, Culhane, Nemerov & Singer, P. C.,* attorneys), for appellant.

*Floyd Abrams* of counsel *(Dean Ringel* and *Steven Lieberman* with him on the brief; *Cahill Gordon & Reindel* and *George Freeman,* attorneys), for New York Times Company and others, respondents.

*Philip Mandel* of counsel *(Golden & Mandel,* attorneys), for Theodore Ehrenreich, respondent.

## OPINION OF THE COURT

RUBIN, J.

If there is a single element which distinguishes a free society from an authoritarian State, it is the ability of the people in general, and the press in particular, to criticize the government in power. Especially where official acts are shielded from public view by privilege and confidentiality is discussion in the free press essential to prevent the abuse of authority. A necessary corollary of the political philosophy reflected in the First Amendment to the United States Constitution is the subordination of the right of a government official or public figure to bring an action in defamation against his critics to the paramount interest which is served by assuring that the open and spirited discussion of matters of public concern will not be chilled by the threat of litigation.

The gravamen of plaintiff's contention upon this appeal is that, because four investigations found no illegality or misconduct in office, reported charges and inferences to that effect contained in articles published in the New York Times are actionable. But these findings are not dispositive of whether the office over which plaintiff presided was performing the function allocated to it in the manner which best promotes the public benefit. This is a policy question within the purview of a coordinate branch of government regarding which this court expresses no opinion as a matter of comity. However, it is a concern about which the public has a right to sufficiently detailed information to enable them to form an enlightened opinion. Bearing in mind these considerations, the legal analysis of this dispute is straightforward.

Plaintiff Gross is a former Chief Medical Examiner of the City of New York. Between January 1985 and February 1986, he and his department were the subject of a series of investigative reports published by the New York Times (the Times). The reports focused on the questions which arose regarding the conduct of Gross and the Office of the Chief Medical Examiner in the performance of certain autopsies, including several which were performed on the corpses of people who died while in police custody. In response to the brewing controversy, four investigations were initiated by public officials to examine possible illegal or incompetent conduct. Each of the four commissions concluded that Gross had not committed any crime nor engaged in any professional misconduct. This action ensued. The verified complaint, which asserts 13 causes of action sounding in defamation based upon statements made in the series of articles published by the Times, was dismissed by Supreme Court for failure to state a cause of action.

The New York State Constitution guarantees free speech, declaring that "[e]very citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right" (NY Const, art I, § 8). The Court of Appeals has held that this provision contains more expansive language than the Federal Constitution and reflects " 'the consistent tradition in this State of providing the broadest possible protection to "the sensitive role of gathering and disseminating news of public events" ' " *(Immuno AG. v Moor-Jankowski,* 77 NY2d 235, 249 *[Immuno II],* cert denied — US —, 111 S Ct 2261, quoting *O'Neill v Oakgrove Constr.,* 71 NY2d 521, 528-529). In order for a public official to maintain an action in defamation against a media defendant regarding an issue of public concern, the plaintiff must establish that the offending statements were known to be false or were made with actual malice, viz., that the defamatory statements were published "with actual knowledge that they were false or with reckless disregard for their truth or falsity" *(Silsdorf v Levine,* 59 NY2d 8, 17, *cert denied* 464 US 831, citing *New York Times Co. v Sullivan,* 376 US 254, 280).

Both State and Federal defamation law has recognized a distinction between actionable fact and protected opinion. However, the United States Supreme Court, in its most recent pronouncement regarding the actionability of expressions of opinion, stated that there is no "wholesale defamation exemption for anything that might be labeled 'opinion.' " *(Milkovich*

*v Lorain Journal Co.,* 497 US 1, —, 110 S Ct 2695, 2705.) The Supreme Court has thereby restricted the concept of absolutely protected pure opinion in Federal jurisprudence.

The Court of Appeals has declined to adopt this development in the Federal law of defamation in its interpretation of the New York State Constitution. Rather, the Court of Appeals has expressly reaffirmed the operative standard for distinguishing actionable fact from protected opinion articulated in *Steinhilber v Alphonse* (68 NY2d 283; *Immuno II,* 77 NY2d, *supra,* at 252).

In determining whether a particular statement is actionable, New York State law draws a distinction based upon whether an expression may be said to constitute pure opinion or not. "A 'pure opinion' is a statement of opinion which is accompanied by a recitation of the facts upon which it is based" or "does not imply that it is based upon undisclosed facts" *(Steinhilber v Alphonse, supra,* at 289). "An expression of pure opinion is not actionable" *(supra,* at 289). The purpose behind this formulation of the rule is "to ensure that the reader has the opportunity to assess the basis upon which the opinion was reached in order to draw his own conclusions concerning its validity" *(Silsdorf v Levine, supra,* at 13-14). The Court of Appeals has stated that the doctrine of nonactionable pure opinion "is justified by our commitment to the principle that free and open debate on matters of public concern is not to be discouraged by the spectre of the imposition of libel damages for the expression of a harsh or unpopular opinion" *(Silsdorf v Levine, supra,* at 13).

By contrast, statements which cannot be said to constitute pure opinion do not enjoy the same protection. Thus, if "the statement of opinion implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it, it is a 'mixed opinion' and is actionable" *(Steinhilber v Alphonse, supra,* at 289). The actionable element of mixed opinion is the "implication that the speaker knows certain facts, unknown to his audience, which support his opinion and are detrimental to the person about whom he is speaking" *(Steinhilber v Alphonse, supra,* at 290). Actionable mixed opinion will also be found where, as in pure opinion, the facts upon which opinion is based are set forth but those facts are "either falsely misrepresented or grossly distorted" *(Chalpin v Amordian Press,* 128 AD2d 81, 85). "Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' de-

bate on public issues" *(Gertz v Robert Welch, Inc.,* 418 US 323, 340, citing *New York Times Co. v Sullivan,* 376 US 254, 270, *supra).* An action in defamation can thus be maintained against a media defendant who has published an expression of actionable mixed opinion regarding matters of public concern with actual malice as to the facts underlying the opinion *(Silsdorf v Levine, supra; Chalpin v Amordian Press, supra).*

Language which consists merely of rhetorical hyperbole is not actionable opinion *(Steinhilber v Alphonse, supra,* at 291). Furthermore, "[s]peculations as to the motivations and potential future consequences of proposed conduct generally are not readily verifiable, and are therefore intrinsically unsuited as a foundation for libel" *(Immuno AG. v Moor-Jankowski,* 74 NY2d 548, 560 *[Immuno I], vacated* — US —, 110 S Ct 3266, *on remand Immuno II,* 77 NY2d 235 *cert denied* — US —, 111 S Ct 2261, *supra).* However, "[w]hile inquiry into motivation is within the scope of absolute privilege, outright charges of illegal conduct, if false, are protected solely by the actual malice test" *(Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 382, *rearg denied* 42 NY2d 1015, *cert denied* 434 US 969). For words to be considered actionable expression of opinion charging the plaintiff with a crime, the expression must allege that the plaintiff had committed " 'an indictable offense upon conviction of which punishment may be inflicted' " *(600 W. 115th St. Corp. v Von Gutfeld,* 169 AD2d 56, 63-64, quoting *Privitera v Town of Phelps,* 79 AD2d 1, 3).

The Court of Appeals has rejected the adoption of a neutral reporting privilege which would allow a newspaper to freely repeat statements made by third parties provided that the newspaper does not endorse the statements reported *(Weiner v Doubleday & Co.,* 74 NY2d 586, 594, *cert denied* 495 US 930). The court has noted, however, that journalistic commentary and criticism are generally protected as opinion *(Immuno I,* 74 NY2d, *supra,* at 557; *Lesyk v Putnam County News & Recorder,* 164 AD2d 881, 882).

It is for the court to decide, as a matter of law, whether an expression consists of fact or opinion based upon a consideration of the entire published communication, viewed in context from the perspective of the average person *(Immuno II,* 77 NY2d, *supra,* at 253). While there are no rigid criteria for distinguishing fact from opinion, there are four factors which provide helpful guidance: "(1) an assessment of whether the specific language in issue has a precise meaning which is

readily understood or whether it is indefinite and ambiguous; (2) a determination of whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might 'signal to readers or listeners that what is being read or heard is likely to be opinion, not fact' " *(Steinhilber v Alphonse, supra,* at 292, quoting *Ollman v Evans,* 750 F2d 970, 983, *cert denied* 471 US 1127).

The series of articles giving rise to appellant's complaint describe a controversy involving Gross' performance as Chief Medical Examiner. These articles summarize the various allegations and criticisms leveled against Gross. Typical is the article which appeared on page 1 of the New York Times on January 27, 1985, a significant portion of which is alleged in the verified complaint to be defamatory, including the opening paragraphs.

"New York City's Chief Medical Examiner has produced a series of misleading or inaccurate autopsy reports on people who died in custody of the police, according to colleagues in the Medical Examiner's office and pathologists elsewhere.

"The Medical Examiner, Dr. Elliot M. Gross, has instituted a policy of special handling for police-custody cases. In many, Dr. Gross has performed the autopsies himself. In others, documents show that he intervened to alter the findings of other pathologists."

The remaining portions of the article alleged to be defamatory detail asserted misconduct by Gross in connection with a number of cases handled by the Medical Examiner's Office, but the discussion of the Eleanor Bumpurs case is representative.

"One case is that of Eleanor Bumpurs, the 66-year-old Bronx woman who was shot to death last October by police officers trying to evict her.

"The pathologist who performed the autopsy found that Mrs. Bumpurs was hit by two shotgun blasts. But according to the pathologist, Dr. Jon S. Pearl, Dr. Gross ordered the cause of death reworded to leave open the possibility that she was hit by just one blast, as the police had reported * * *

"Dr. Theodore Ehrenreich, a pathologist on the faculties of New York University and the Mount Sinai Medical Center,

who has reviewed most of the disputed autopsy findings, said he found them 'shocking.'

" 'If he did these cases honestly, Dr. Gross is unbelievably incompetent,' Dr. Ehrenreich said. 'If he has done this deliberately—and I believe he has—he may well be looking for a way out for the police.' * * *

"[Eleanor Bumpurs case] the associate medical examiner who performed the autopsy, Dr. Pearl, said his autopsy the day after the death had shown beyond doubt that both shots had hit Mrs. Bumpurs * * *

"But Dr. Gross, Dr. Pearl said in an interview, told him to change the cause of death. 'He told me it wasn't clear,' Dr. Pearl said.

"Dr. Pearl said Dr. Gross had telephoned him at least three times over the next few days, always with the same question: How many shots had struck Mrs. Bumpurs? 'Every time, I gave him an absolutely clear answer that she was shot twice,' Dr. Pearl said.

"On his report, Dr. Pearl wrote the cause of death as 'shotgun wounds (two) of chest, hand and lung.' He said he always included the number of shots in parenthesis to avoid confusion.

" 'Dr. Gross had never questioned it before,' he said.

"But Dr. Gross told him to change the finding to 'shotgun wound of chest and lung, shotgun wound of hand,' without the number * * *

"Despite the ambiguity in the cause of death, a reading of the full report made clear that both blasts must have hit Mrs. Bumpers. When a reporter called the Medical Examiner to verify that, Dr. Gross would not comment."

For completeness, it is appropriate to supply a passage from the Times article not included in the complaint: "One reason for Dr. Pearl's certainty is that he counted wounds for at least 10 pellets and believed the body had been hit by more. A 12-gauge shotgun round contains only nine pellets."

An article which appeared in the Times on the following day was devoted to a discussion of the circumstances surrounding the death of Michael Stewart, a 25-year-old black man arrested by white transit police officers for writing graffiti. He arrived at Bellevue Hospital hogtied with elastic cord, unconscious and covered with bruises. He died 13 days later without ever regaining consciousness. The autopsy was

conducted by plaintiff Gross and attended by Dr. John Grauerholz, a forensic pathologist hired by the Stewart family and Siegfried Oppenheim, a medical stenographer. Also among the observers were two transit police detectives.

The complaint alleges that portions of the article are defamatory, including the following:

"Within hours, New York City's Chief Medical Examiner, Dr. Elliot M. Gross, announced that there was no evidence that physical injury had caused the death * * *

"A New York Times investigation has found that the handling of the Stewart autopsy became an extraordinary mixture of contradiction and—according to some people involved in the case—deception.

" 'Dr. Gross has lied,' said Dr. Robert L. Wolf, one of the Stewart family's doctors and a clinical professor of medicine at Mount Sinai Medical Center. 'He has couched the lie in language that is so obviously absurd that, even without any medical education, people should be able to deduce that he lied.'

"Pathologists in the Medical Examiner's office who are familiar with the case, and doctors representing the Stewart family, make the same charge * * *

"Louis Clayton Jones, one of the family's lawyers said he believed that 'there was some sort of collusion between him and the transit police.' * * *

" 'I was horrified,' Siegfried Oppenheim, the medical stenographer who took the dictation from Dr. Gross during the autopsy, said of that preliminary finding.

" 'Gross had completely disregarded the history of the case and the photographs,' he said. 'Where was the mention of the bruises in the cause of death? Where was the mention of the fact that he died in police custody? You're supposed to put all of that in the autopsy report.'

"Mr. Oppenheim, who says he witnessed over 10,000 autopsies over a 40-year period, resigned last year. 'I want nothing to do with that place,' he said * * *

"According to Dr. Wolf, the autopsy had shown there were 60 hemorrhages all over the body. Yet in describing the cause of death, the preliminary autopsy report said only: 'Cardiac arrest with survival for 13 days. Bronchopneumonia: Pending further study.'

"Several doctors said they were appalled by that finding.

" 'He said the cause of death was cardiac arrest,' said Dr. Wolf, an internist, 'yet he describes no intrinsic cardiac disease whatsoever. What Dr. Gross was really saying was that Stewart died because his heart stopped beating, but that doesn't mean anything.'

"Dr. Wolf said Dr. Gross's claim that physical injury had not caused the death was 'an outrageous statement—it's called a blatant lie.'

"During the autopsy, Dr. Grauerholz said, pinpoint bleeding —known as petechial hemorrhages—had been seen in the eyes.

"Such hemorrhages are viewed by pathologists as a standard sign of strangulation. Because blood flow from the head is cut off, blood backs up, causing vessels in the eyes to burst.

"The Stewart family asserts that Dr. Gross agreed before the autopsy that anything done to the body would take place only after the family's doctors had been notified. The doctors would be allowed to observe any procedure.

"But on September 30, the day after the autopsy, Dr. Gross returned to the autopsy room and removed Mr. Stewart's eyes.

"According to Dr. Grauerholz, Dr. Gross placed the eyes in a container of Formalin, a solution that preserves tissue but tends to wash out any trace of blood. 'It bleaches out the red cells,' Dr. Grauerholz said."

These and other articles complained of report accusatory opinions together with a recitation of the facts upon which they are based. Especially when attributed to a source, the average reader will recognize that criticisms, allegations and accusations are not statements of fact but rather expressions of opinion. The articles identify the various individual critics and commentators, describing their credentials or identifying them in some way so that the source of their knowledge and expertise to evaluate the facts is evident. In addition, the details of specific incidents giving rise to the reported allegations and criticisms are supplied. Thus, the allegations of professional misconduct and misjudgment constitute pure nonactionable opinion (Steinhilber v Alphonse, supra). The Times provided the public with the requisite factual basis supporting the opinions, allowing analysis of the issues and contributing to discussion of a matter of public concern. There is no question that the professional conduct of the Chief Medical Examiner, a public official, is a proper and necessary focus of public interest and discussion.

Nothing in the complaint suggests that any cause of action is based upon statements contained in the Times articles which accuse Gross of criminal conduct. However, on appeal, plaintiff takes the position that they may be read to encompass the Federal crime of obstructing justice (18 USC § 1505) and State crimes of official misconduct, falsification of documents and obstructing governmental administration.

Significantly, none of the statements critical of Gross reported in the Times articles specifically accuses him of criminal wrongdoing. Vague allegations of a "cover-up" or that Gross "lied" (in arriving at a conclusion as to a cause of death) do not amount to accusations of criminal misconduct *(Arrigoni v Velella,* 110 AD2d 601).

The articles report charges that Gross altered, or directed subordinates to alter, entries regarding the cause and manner of death. While such alteration might constitute a violation of law, it also might simply reflect the exercise of the Chief Medical Examiner's prerogative to substitute his own interpretation of the medical evidence for the conclusion reached by a member of his staff. Likewise, allegations that autopsy results were misstated or did not accurately reflect the condition of the body might suggest that evidence was ignored or tampered with, but they might also reflect inadvertence, mistake, incompetence or poor note-taking. That a given statement *might* be interpreted as an allegation of wrongdoing is not sufficient to render it actionable. Courts will not strain to interpret a statement as either libelous or nondefamatory *(Arrigoni v Velella, supra,* at 603).

As we construe the series of Times articles at issue in this case, the criticism leveled at Gross by his detractors is that he was entirely too solicitous of the interests of the police department and its members in his stewardship of the Office of the Chief Medical Examiner. While the excerpts from the articles which are alleged to be defamatory suggest that the independence and professional integrity of the Office of the Chief Medical Examiner had been compromised, the reader is not led to draw any particular conclusion as to the cause of this state of affairs. Mistake, improper methodology, poor judgment, professional differences of opinion, poor record-keeping, disagreement over the role of the Medical Examiner's Office and "medical misconduct" are all mentioned as contributing factors.

Moreover, to find that the actions of plaintiff Gross consti-

tute illegality, it would be necessary to find that he violated the standards of conduct which govern forensic pathologists and medical examiners. As the report of the Commissioner of the New York State Department of Health (dated Mar. 23, 1990), David Axelrod, M.D., points out, there simply are no such recognized standards. Furthermore, the report notes that there are "essentially different approaches to the practice of forensic pathology", one of which takes the position "that the medical examiner is merely part of a system that includes the police and the district attorney, and that the medical examiner must often defer to the judgments or conclusions of others including the district attorney". According to this view, the practice of classifying a death as "undetermined pending investigation", for which Gross was strongly criticized in the Times articles, is warranted in order to permit the presentation of the case to a Grand Jury, which will then presumably make the ultimate determination as to whether the death was the result of accident or homicide.

We conclude that none of the complained of statements in the articles can be construed as accusing Gross of committing punishable criminal offenses. Language such as "whitewash" and "weaseling" is mere rhetorical hyperbole and not actionable opinion. Those statements which describe Gross' conduct as motivated by a desire to assist and protect the police are also protected opinion because they constitute speculation as to motivation (*Immuno I,* 74 NY2d 548, 560, *supra*).

Therefore, upon review of each article in the context of the communication as a whole, it is held that the complained of language constitutes nonactionable opinion.

Accordingly, the order of the Supreme Court, New York County (Elliott Wilk, J.), entered June 13, 1991 (*Gross v New York Times Co.,* 151 Misc 2d 571), which granted defendants' motion pursuant to CPLR 3211 (a) (7) for an order dismissing the complaint against them, should be affirmed, without costs.

CARRO, J. P., KUPFERMAN and Ross, JJ., concur.

Order of the Supreme Court, New York County, entered June 13, 1991, which granted the Times defendants' motion pursuant to CPLR 3211 (a) (7) for an order dismissing the complaint against them, is affirmed, without costs.