Nicholas **COLINIATIS**, Plaintiff,

v.

Simos C. **DIMAS**, Dimas & Johnston, and The **National Herald**, Defendants.

No. 92 Civ. 8372 (SWK).

United States District Court, S.D. New York.

March 31, 1994.

Fink Weinberger P.C. by Edward C. Kesselman, New York City, for plaintiff.

Kramer, Levin, Naftalis, Nessen, Kamin & Frankel by Ellen R. Nadler, New York City, for defendants Simos C. Dimas and Dimas & Johnston.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

This action for libel, tortious interference with employment and intentional infliction of emotional distress arises out of a letter written by a law firm to its client containing allegations that plaintiff Nicholas Coliniatis ("Coliniatis") was involved in an illegal kickback scheme. Presently before the Court is a motion by defendants Simos C. Dimas ("Dimas") and Dimas & Johnston (collectively, the "Dimas Defendants") to dismiss the First, Third and Fourth Causes of Action, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim. For the reasons set forth below, the Dimas Defendants' motion is granted in part and denied in part.

### BACKGROUND [1]

Olympic Airways ("Olympic") is a state enterprise owned by the Republic of Greece. In 1989, Coliniatis was employed at Olympic

---

1. For purposes of this motion, the facts alleged in the complaint are accepted as true. *See Frasier v. General Elec. Co.,* 930 F.2d 1004, 1007 (2d Cir.1991).

as Director of Operations for North and South America. Defendant Dimas & Johnston is a law firm that provided legal services to Olympic from 1983 to 1992. Defendant Dimas is a partner of Dimas & Johnston.

In 1992, Olympic sold its leasehold interest in certain commercial office space, and purchased other real property in New York (the "Transaction"). The Dimas Defendants represented Olympic in the Transaction. Olympic also retained Nicholas Sfouggatakis ("Sfouggatakis"), a licensed real estate broker and certified public accountant, to provide tax advice in connection with the Transaction.

On September 16, 1992, Dimas wrote a letter to Loukas Grammatikos ("Grammatikos"), Olympic's Director General, informing him of allegations that Coliniatis was involved in a possible kickback scheme related to the Transaction (the "Letter").[2] The Letter stated, in relevant part:

> I find myself professionally obligated to relay to you information of substantial but not absolute reliability suggesting a scheme to defraud Olympic of over $500,-000 by one of its trusted agents.... It seems Mr. Coliniatis expected to receive a kick-back from all of the professional arrangements entered into between Mr. Sfouggatakis and Olympic. When I spoke to him, Mr. Sfouggatakis told me that Mr. Coliniatis had told him that as a condition for obtaining these arrangements with Olympic, Mr. Sfouggatakis would be required to pay Mr. Coliniatis the first $280,-000 which Mr. Sfouggatakis received, and then to pay him 50% of all remaining money received. If this be true, Mr. Coliniatis was planning to obtain $500,000 back from Mr. Sfouggatakis. And if that be true, that number would be but the beginning of the scheme.

*See* the Letter, annexed to the Complaint as Exh. "A."

**2.** The full content of the Letter is set forth in the Appendix attached to this Memorandum Opinion and Order.

**3.** New York substantive law is applicable in this diversity case, as New York has the most significant relationship to the parties and events giving

On October 3, 1992, defendant The National Herald (the "Herald"), a Greek language newspaper distributed in New York, published an article containing certain of the statements set forth in the Letter. Coliniatis subsequently was recalled to Greece and relieved of his duties as Olympic's Director of Operations for North and South America. As a result, on November 19, 1992, he brought this action for libel (First Cause of Action), tortious interference with employment (Third Cause of Action) and intentional infliction of emotional distress (Fourth Cause of Action) against the Dimas Defendants, and for libel (Second Cause of Action) against the Herald.

## DISCUSSION

The Dimas Defendants now move, pursuant to Rule 12(b)(6), for an order dismissing the complaint on the grounds that it fails to state a claim upon which relief can be granted. It is well settled that, when passing on a motion to dismiss, the Court must accept the allegations of the complaint as true and construe them in favor of the pleader. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Goldman v. Belden,* 754 F.2d 1059, 1065 (2d Cir.1985) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).

### I. Libel

With respect to the First Cause of Action for libel, the Dimas Defendants contend that the statements contained in the Letter are not actionable as they consist of opinion protected by constitutional law. The Court finds that Coliniatis's libel claim is subject to whatever protections the First Amendment of the United States Constitution and the New York Constitution provide.[3]

rise to this action. *See Chrysler Capital Realty, Inc. v. Grella,* 942 F.2d 160, 162 (2d Cir.1991); *Machleder v. Diaz,* 801 F.2d 46, 51 (2d Cir.1986) (applying the substantive tort law of the state with the most significant relationship to the occurrence and the parties), *cert. denied,* 479 U.S.

*See McNally v. Yarnall,* 764 F.Supp. 838, 846 (S.D.N.Y.1991); *J & J Sheet Metal Works, Inc. v. Picarazzi,* 793 F.Supp. 1104, 1108 (N.D.N.Y.1992). Whether a statement constitutes fact or opinion is a matter of law, and thus may be resolved by the Court on a motion to dismiss. *Trump v. Chicago Tribune Co.,* 616 F.Supp. 1434, 1435 (S.D.N.Y. 1985); *see also Church of Scientology Int'l v. Eli Lilly & Co.,* 778 F.Supp. 661, 667 (S.D.N.Y.1991) (quoting *Davis v. Ross,* 754 F.2d 80, 85 (2d Cir.1985)). Accordingly, the Court will examine the federal and state constitutions in turn.

## A. The United States Constitution

■■■ First Amendment-based protection for defamatory statements categorized as "opinion" stems from dicta set forth in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (*"Gertz"*). In *Gertz,* the Supreme Court stated:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.

*Id.* at 339–40, 94 S.Ct. at 3007. More recently, however, the Supreme Court has put to rest the perception that *Gertz* created a wholesale protection for all statements that are labeled "opinion." *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 18, 110 S.Ct. 2695, 2705, 111 L.Ed.2d 1 (1990) (*"Milkovich"*). Pursuant to *Milkovich,* a statement is actionable where it reasonably appears to state or imply assertions of objective fact, regardless of whether it is characterized as a fact or an opinion. *Id.* at 20, 110 S.Ct. at 2706; *see also J & J Sheet Metal Works, Inc. v. Picarazzi,* 793 F.Supp. at 1109. Statements of opinion on matters of public concern are protected under the First Amendment only where they do not contain a provably false factual connotation, or where they "cannot reasonably [be] interpreted as stating actual facts about an individual." *Milkovich v. Lorain Journal*

*Co.,* 497 U.S. at 20, 110 S.Ct. at 2706 (quoting *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 50, 108 S.Ct. 876, 879, 99 L.Ed.2d 41 (1988)); *see also McNally v. Yarnall,* 764 F.Supp. at 846; *Don King Prods., Inc. v. Douglas,* 742 F.Supp. 778, 782 (S.D.N.Y. 1990). Accordingly, in order to establish whether the Letter is an opinion protected from state libel law, the Court must determine whether the Letter (1) addresses matters of public concern; (2) is expressed in a manner that is provably true or false; and (3) can be reasonably interpreted as intended to convey actual facts about a person. *McNally v. Yarnall,* 764 F.Supp. at 847; *Don King Prods., Inc. v. Douglas,* 742 F.Supp. at 782. "The question must be answered on the basis of what the average person hearing or reading the communication would take it to mean." *J & J Sheet Metal Works, Inc. v. Picarazzi,* 793 F.Supp. at 1109.

■■■ The Court finds that the Letter is not an opinion under the First Amendment, and is therefore not exempt from state libel law. First, the Letter addresses an area of public concern, the possibility that Coliniatis was engaging in an illegal scheme to defraud Olympic, an arm of the government of Greece. Second, the truth or falsity of the statement that Coliniatis expected to receive a kick-back from all of the professional arrangements entered into between Sfouggatakis and Olympic can be factually verified. Third, the statements contained in the Letter are not "the sort of loose, figurative or hyperbolic language which would negate the impression that the writer [is] seriously maintaining" that plaintiff engaged in an illegal kickback scheme. *See Milkovich v. Lorain Journal Co.,* 497 U.S. at 21, 110 S.Ct. at 2707; *see also Church of Scientology Int'l v. Eli Lilly & Co.,* 778 F.Supp. at 668 ("Although subjective in tone, the commentary purports to be based on actual facts, and to be pointing out their implications, not to be making a personal prediction or hyperbolic characterization.").

1088, 107 S.Ct. 1294, 94 L.Ed.2d 150 (1987); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)

(holding that federal court in diversity action should apply choice of law rules of state in which court sits).

■ Moreover, the fact that the Letter purports to merely relay information that Sfouggatakis told to Dimas does not convert the statements into a constitutionally-protected opinion. Rather, the Letter's reference to information that is of "substantial but not absolute reliability," and "plausible, but unproven" allegations implies that the charges are based on verifiable fact. Thus, to the extent that the Letter contains defamatory factual statements, these statements are not "opinions" shielded by the Constitution. Rather, plaintiff's libel claim is actionable if he can prove that the factual assertions contained in the Letter are actually false. *J & J Sheet Metal Works, Inc. v. Picarazzi,* 793 F.Supp. at 1109. As the parties have not yet engaged in discovery at this early stage of the action, the Court declines to examine whether Coliniatis has raised any triable issue of fact as to the falsity of the factual assertions contained in the Letter.

### B. The New York State Constitution

■ The Court next examines New York constitutional law, keeping in mind that the " 'protection afforded by the guarantees of free press and speech in the New York Constitution is often broader than the minimum required by' the Federal Constitution." *Immuno AG. v. Moor–Jankowski,* 77 N.Y.2d 235, 566 N.Y.S.2d 906, 914, 567 N.E.2d 1270, 1278 (1991) (quoting *O'Neill v. Oakgrove Constr., Inc.,* 71 N.Y.2d 521, 529, n. 3, 528 N.Y.S.2d 1, 523 N.E.2d 277 (1988)), *cert. denied,* —— U.S. ——, 111 S.Ct. 2261, 114 L.Ed.2d 713 (1991). Under both federal and state law, a statement is actionable where a reasonable reader could conclude that the challenged statements convey actual facts about the plaintiff. *600 West 115th Street Corp. v. Von Gutfeld,* 80 N.Y.2d 130, 589 N.Y.S.2d 825, 829, 603 N.E.2d 930, 934 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2341, 124 L.Ed.2d 252 (1993). The New

York Court of Appeals differs from the Supreme Court, however, in the applicable test to use in determining whether the challenged statements imply objective facts. *Id.* Thus, while federal law examines the challenged statements for express and implied factual assertions and finds them actionable unless couched in loose, figurative or hyperbolic language, the New York courts begin their analysis by looking at "the content of the whole communication, its tone and apparent purpose." *Immuno AG. v. Moor–Jankowski,* 566 N.Y.S.2d at 914, 567 N.E.2d at 1278.

■ New York has adopted the four-part test first developed in *Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985), to differentiate between fact and opinion. *See Steinhilber v. Alphonse,* 68 N.Y.2d 283, 508 N.Y.S.2d 901, 905, 501 N.E.2d 550, 554 (1986). Under the *Ollman/Steinhilber* test, the Court must (1) assess whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous; (2) determine whether the statement is capable of being objectively characterized as true or false; (3) examine the full context of the communication in which the statement appears; and (4) consider the broader social context or setting surrounding the communication, including the existence of any applicable customs or conventions that might " 'signal to readers or listeners that what is being read or heard is likely to be opinion, not fact.' " *Id.* (quoting *Ollman v. Evans,* 750 F.2d at 983).

■ Applying these four factors, the Court finds that the statements contained in the Letter, "although couched in the language of hypothesis or conclusion, actually would be understood by the reasonable reader as assertions of fact." *Gross v. New York Times Co.,* 82 N.Y.2d 146, 603 N.Y.S.2d 813, 818, 623 N.E.2d 1163, 1168 (1993).[4] The

---

4. Ironically, the Dimas Defendants dedicate the crux of their argument to the contention that the Court should follow the First Department's holding in *Gross v. New York Times Co.,* 180 A.D.2d 308, 587 N.Y.S.2d 293 (1st Dep't 1992). In fact, the Dimas Defendants argue that the First Department's findings were written "[i]n language that could well have been written about the Dimas letter." *See* Reply Memorandum of the Di-

mas Defendants in Support of Their Motion to Dismiss the Complaint, at 13. Neither party bothered to inform the Court, however, that the First Department's holding was reversed by the New York Court of Appeals in an opinion issued after this motion became fully submitted. *See Gross v. New York Times Co.,* 82 N.Y.2d 146, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (1993). The Court reminds the parties of their continuing

Letter charges Coliniatis with criminal behavior in precise language that is both readily understandable and verifiable. Thus, the first two factors of the *Ollman/Steinhilber* test are met.[5]

The Court next examines the particular circumstances in which the Letter was drafted, as well as the broader social context of the communication. Reviewing these two factors, the Court finds that the Letter does not give the general impression that it is an opinion. Thus, the charge that Coliniatis was involved in an illegal kickback scheme "cannot be treated as a mere rhetorical flourish or the speculative accusation of an angry but ill-informed citizen made during the course of a heated debate." *Id.* 603 N.Y.S.2d at 819, 623 N.E.2d at 1169. Rather, the Letter gives the impression that it was written after lengthy deliberation. Accordingly, the Letter's verbal context suggests to the reader that the statements were intended to be understood as assertions of fact.

An examination of the broader social context in which the Letter was written leads the Court to the same conclusion. The statements contained in the Letter were made in the context of an attorney-client relationship in which the attorney sought to relay sensitive information of importance to his client, presumably because of his professional obligation to do so. Under these circumstances, the Court finds that a reasonable reader would believe that the Letter was conveying facts about the plaintiff.

■ The Dimas Defendants contend that the Letter is not actionable as it merely reports Sfouggatakis's allegations and opines that the allegations are of sufficiently serious nature to require further investigation. Thus, the Dimas Defendants contend that the writing is a "pure opinion," as it is accompanied by a recitation of the facts upon which it is based. *See Steinhilber v. Alphonse,* 508 N.Y.S.2d at 903, 501 N.E.2d at 552; *see also Gross v. New York Times Co.,* 603 N.Y.S.2d

at 818, 623 N.E.2d at 1168. It is true that opinions are protected where the facts supporting them are fully and accurately set forth in sufficient detail for the reader to draw his own conclusions concerning the opinion's validity. *Silsdorf v. Levine,* 59 N.Y.2d 8, 462 N.Y.S.2d 822, 825, 449 N.E.2d 716, 719 (1983), *cert. denied,* 464 U.S. 831, 104 S.Ct. 109, 78 L.Ed.2d 111 (1983); *see also Gross v. New York Times Co.,* 603 N.Y.S.2d at 818, 623 N.E.2d at 1168. Where the facts themselves are false, however,

> plaintiff may be able to establish entitlement to recover damages for the defamatory opinions, assuming, of course, that he is able to demonstrate the falsity of the letter's statements of fact and convince the triers of fact that the factual disparities would affect the conclusions drawn by the average reader regarding the validity of the opinions expressed.

*Silsdorf v. Levine,* 462 N.Y.S.2d at 826, 449 N.E.2d at 720; *see also Parks v. Steinbrenner,* 131 A.D.2d 60, 520 N.Y.S.2d 374, 376 (1st Dep't 1987) (stating that an opinion is actionable where it "is ostensibly accompanied by a recitation of the underlying facts upon which the opinion is based, but those underlying facts are either falsely misrepresented or grossly distorted.").

■ In the case at hand, Coliniatis does not contend that he was defamed by the Dimas Defendants' opinion as to the necessity for further investigation. Rather, the complaint asserts that the Dimas Defendants implied that plaintiff was engaged in an illegal fraud and "kick-back" scheme. *See* complaint at ¶¶ 16, 25. As the complaint alleges that these statements "were and are wholly false and defamatory," *see* complaint at ¶ 24, the Court cannot dismiss the complaint on the ground that the Letter is a protected opinion. Accordingly, as the Court finds that the Letter is not a "pure opinion" protected under New York constitutional law, the Di-

---

duty to fully inform the Court of the applicable law. *See, e.g.,* N.Y.Code of Professional Responsibility EC 7–23.

**5.** Contrary to Coliniatis's assertion, however, the Court finds that there is no special rule of law

making allegations of criminal conduct actionable regardless of whether they are asserted as opinion or fact. *Id.* 603 N.Y.S.2d at 819, 623 N.E.2d at 1169.

mas Defendants' motion to dismiss the First Cause of Action is denied.[6]

## II. Tortious Interference With Employment

■ The Dimas Defendants next move to dismiss the Third Cause of Action for tortious interference with employment. While Coliniatis contends that his employment with Olympic in 1992 was governed by an express employment agreement, *see* Memorandum of Law by Plaintiff in Opposition to Motion to Dismiss the Complaint, at 4, the complaint fails to allege the existence of any employment contract between Coliniatis and Olympic. In the absence of a contract of employment, Coliniatis is an employee-at-will. *See Patrowich v. Chemical Bank,* 98 A.D.2d 318, 470 N.Y.S.2d 599, 602–03 (1st Dep't 1984), *aff'd,* 63 N.Y.2d 541, 483 N.Y.S.2d 659, 473 N.E.2d 11 (1984); *Citera v. Chemical Bank,* 105 A.D.2d 636, 481 N.Y.S.2d 694, 696 (1st Dep't 1984).

■ Interference with a contract terminable at will falls into the same category as interference with prospective contractual relations. *See Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 428 N.Y.S.2d 628, 633, 406 N.E.2d 445, 450 (1980). To prove tortious interference, Coliniatis must establish that the Dimas Defendants interfered "with business relations existing between the plaintiff and a third party, *either* with the sole purpose of harming the plaintiff *or* by means that are 'dishonest, unfair or in any other way improper.'" *Martin Ice Cream Co. v. Chipwich, Inc.,* 554 F.Supp. 933, 945 (S.D.N.Y.1983) (quoting *Robbins v. Ogden Corp.,* 490 F.Supp. 801, 811 (S.D.N.Y.1980)) (emphasis in the original); *see also PPX Enters., Inc. v. Audiofidelity Enters., Inc.,* 818 F.2d 266, 269 (2d Cir.1987) (same); *NRT Metals, Inc. v. Laribee Wire, Inc.,* 102 A.D.2d 705, 476 N.Y.S.2d 335, 338 (1st Dep't 1984) (finding that proof of either malice or the use of unlawful means is necessary to sustain an action for interference with an at-will business relationship).

■ The Dimas Defendants contend that Coliniatis has failed to allege either improper means or a solely malicious motive. The Court disagrees. The complaint alleges that the defendants acted improperly by failing to investigate or verify the defamatory charges made in the Letter. *See* complaint at ¶ 41. Thus, if Coliniatis can prove that the Letter is defamatory, he can also establish that the Dimas Defendants utilized improper means to interfere with his business relationship with Olympic. Accordingly, the defendants' motion to dismiss the tortious interference claim for failure to state a cause of action is denied. *See McNally v. Yarnall,* 764 F.Supp. at 853 (holding that the defamation claims determine the tortious interference claims).

## III. Intentional Infliction of Emotional Distress

■ The Dimas Defendants also move to dismiss the Fourth Cause of Action for intentional infliction of emotional distress. "Under New York law, '[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress.'" *Don King Prods., Inc. v. Douglas,* 742 F.Supp. at 785 (quoting *Fischer v. Maloney,* 43 N.Y.2d 553, 402 N.Y.S.2d 991, 992–93, 373 N.E.2d 1215, 1216–17 (1978)). To state a cause of action for intentional infliction of emotional distress, Coliniatis must show (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. *Howell v. New York Post Co.,* 81 N.Y.2d 115, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699, 702 (1993).

■ With respect to the first element—extreme and outrageous conduct—the conduct must "so transcend[ ] the bounds of

---

**6.** While the Dimas Defendants also contend that the Letter is protected by the qualified privilege afforded to attorney-client communications, the Court finds that issues of fact concerning whether the statements were false and whether the Dimas Defendants were motivated by malice preclude dismissal. *See Kenny v. Cleary,* 47 A.D.2d 531, 363 N.Y.S.2d 606, 609 (2d Dep't 1975); *Schulman v. Anderson Russell Kill & Olick, P.C.,* 117 Misc.2d 162, 458 N.Y.S.2d 448, 454 (S.Ct. N.Y.Co.1982).

decency as to be regarded as atrocious and intolerable in a civilized society." *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 490 N.Y.S.2d 735, 741, 480 N.E.2d 349, 355 (1985). This element may be determined as a matter of law. *Howell v. New York Post Co.*, 596 N.Y.S.2d at 353, 612 N.E.2d at 702.

The Court finds that Coliniatis has failed to allege conduct sufficiently outrageous to sustain a claim for intentional infliction of emotional distress. While Coliniatis contends that the Dimas Defendants intended to charge him with criminal conduct, allegations of criminal conduct cannot be viewed as so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency. *See Krawtchuk v. Banco Do Brasil, S.A.*, 183 A.D.2d 484, 583 N.Y.S.2d 403, 404 (1st Dep't 1992) (dismissing claim for intentional infliction of emotional distress where letter characterized plaintiff's actions as a "crime of theft" and a "crime of extortion"); *Misek–Falkoff v. Keller*, 153 A.D.2d 841, 545 N.Y.S.2d 360, 362 (2d Dep't 1989) (holding that emotional distress claim was properly dismissed for failure to state a claim where publication of defamatory communication charged plaintiff with criminal conduct). Accordingly, the Dimas Defendants' motion to dismiss plaintiff's claim for intentional infliction of emotional distress is granted, and the Fourth Cause of Action is dismissed.

## CONCLUSION

For the reasons set forth above, the Dimas Defendants' motion to dismiss the First and Third Causes of Action for failure to state a claim is denied. The Dimas Defendants' motion to dismiss the Fourth Cause of Action is granted. The parties are directed to appear for a pretrial conference before this Court on Wednesday, April 13, 1994, at 10:30 a.m.

SO ORDERED.

## APPENDIX

DIMAS & JOHNSTON

Attorneys at Law

270 Madison Avenue

New York, N.Y. 10016

September 16, 1992

PERSONAL AND CONFIDENTIAL

Captain Loukas Grammatikos

Olympic Airways, S.A.

Syngrou 96–100

Athens, Greece

Dear Captain Grammatikos:

I am writing in the greatest of confidence and with a very heavy heart. I find myself professionally obligated to relay to you information of substantial but not absolute reliability suggesting a scheme to defraud Olympic of over $500,000 by one of its trusted agents. I also write to inform you of the steps we were forced to take, unilaterally, to protect Olympic's interest in this matter.

For all of 1992, we have been involved in the negotiations surrounding Olympic's sale of its old Fifth Avenue leases to Olympic Tower Associates and its present acquisition of a fee interest in its new building on 42nd Street. We have been troubled throughout the process by certain aspects of the instructions we were receiving from Mr. Coliniatis relating to these matters, but we have also attempted to follow the instructions we were given by him.

One particularly strange aspect of the total transaction concerned the brokerage fee paid on the new property. Normally, brokerage fees are paid by the seller. In this case, Olympic, as buyer, agreed to pay the fee. (Ultimately, of course, the buyer always pays the brokerage fee, indirectly if not directly, and certainly there is nothing wrong with Olympic's agreement to assume this obligation.) What was odd, however, was the fact that the brokerage commission was so high—6%. No one active in real estate would expect to pay this much of a commission on this sort of transaction. All brokers would expect to be negotiated downward. For Olympic to pay more than 3% or 4% at maximum (a $140,000–$210,000 difference) is very odd. Nevertheless, despite my several efforts to obtain permission to negotiate a reduced commission, I was repeatedly instructed by Mr. Coliniatis to let the matter

be. In addition, there were numerous other instances during the course of the price and contract negotiations when the broker would have been expected to break a deadlock in negotiations between buyer and seller by reducing his fee. On each occasion when I spoke to Mr. Coliniatis about approaching the brokers he offered to use Olympic's money, instead.

Tuesday evening, September 13, after he and I had spent most of the day reviewing documents in preparation for the closing, Nicholas Sfouggatakis called me at my office. He sounded anguished and uncomfortable. He told me that he found himself involved in a situation he did not find morally tolerable.

We already knew that the brokers were sharing a portion of their 6% fee with Mr. Sfouggatakis. We did not know what that portion was. Tuesday evening, Mr. Sfouggatakis informed me that of the $420,000 brokerage commission, he was to receive $280,000.

He also informed me that Mr. Coliniatis expected to receive two thirds of this $280,000 fee. This announcement created a grave dilemma for me. The charge was plausible, but unproven. If any employee of Olympic were to ask for and receive a kickback from Mr. Sfouggatakis in connection with this New York property transfer, a serious crime would be committed under New York law.

My partner and I grappled all night with the problems created by Mr. Sfouggatakis' disclosure. In blunt terms, Mr. Sfouggatakis was telling us that Mr. Coliniatis was conspiring to defraud Olympic of some $200,000.

Our duty as attorneys is to Olympic, and ultimately to the Government and people of Greece. We could neither accept the charge as true, nor could we ignore the potential that it might be true.

Wednesday morning, we took Mrs. Papantonopoulou into our confidence and disclosed to her what we had been told. Quite correctly, her immediate concern was with the closing scheduled for later in the day. The building you have now bought is a splendid deal for Olympic. For us to do anything which might have jeopardized the closing of

that transaction would, clearly, not have been in your best interest. We therefore agreed that the closing would continue as scheduled and that nothing would be said about the Sfouggatakis disclosure.

With Mrs. Papantonopoulou's assent, I then called Mr. Sfouggatakis into my office and privately probed the facts of the matter. The situation he described was even more shocking than I had realized. It seems Mr. Coliniatis expected to receive a kick-back from all of the professional arrangements entered into between Mr. Sfouggatakis and Olympic as more fully set forth below.

As you know, in addition to the share of the broker's commission Mr. Sfouggatakis had negotiated, ostensibly for himself, he has entered into an agreement with Mr. Coliniatis to provide accounting services for Olympic at $3,000 per month. Further, he has been handling all aspects of the attempt to qualify this property acquisition as a tax free exchange under § 1031 of the Internal Revenue Code. If he succeeds in that endeavor, he has been promised a substantial award for his efforts.

In all, Mr. Sfouggatakis is scheduled to receive as much as $800,000 from all of this, a term which he has characterized as unconscionable.

Mr. Sfouggatakis has done a very good job for Olympic. It was he who negotiated the terms of the new real estate acquisition, and (except for the brokerage commission) they are very good terms. I do not know if the § 1031 argument is going to succeed, but I dare say if anyone is likely to make it work, it is Mr. Sfouggatakis. He is entitled to a very good fee for his services. But he was correct: $800,000 is an unconscionable amount. It is a figure so large as to compel speculation of underlying corruption.

When I spoke to him, Mr. Sfouggatakis told me that Mr. Coliniatis had told him that as a condition for obtaining these arrangements with Olympic, Mr. Sfouggatakis would be required to pay Mr. Coliniatis the first $280,000 which Mr. Sfouggatakis received, and then to pay him 50% of all remaining money received.

If this be true, Mr. Coliniatis was planning to obtain $500,000 back from Mr. Sfouggatakis. And if that be true, that number would be but the beginning of the scheme. There are millions more to be spent on the rehabilitation of the new building and the letting of the tenant space. We represent contractors. We know perfectly well that there are few contractors who would hesitate a moment to pay tens and indeed hundreds of thousands of dollars to people in a position to award them construction contracts. The same is no doubt true with renting agents. There is a great deal of corrupt money yet to be made from this building, by anyone in a position of power prepared to be corrupt.

As we spoke, Mr. Sfouggatakis reaffirmed that he did not wish to make corrupt and, indeed, criminal payments and that he was receiving too much money and that he had been pained by the situation for months.

He proposed an arrangement in which he would announce his belief that he is being overpaid, and volunteer to process the § 1031 proceeding including the payment to tax counsel, without further charge to Olympic. This will save Olympic hundreds of thousands of dollars.

He signed a letter to you to this effect. I enclose a copy. Mrs. Papantonopoulou is hand carrying an original copy of it to you.

We then proceeded to the closing, where nothing was said about any of this to anybody.

You must now decide how you wish to proceed. If Mr. Sfouggatakis' claim that Mr. Coliniatis was going to take ⅔rds of Mr. Sfouggatakis' money for himself is false, then Mr. Coliniatis should be legitimately delighted by Sfouggatakis' generous proposal to reduce his own fees, to the immediate economic benefit of Olympic.

On the other hand, if Mr. Sfouggatakis has told me, essentially, the truth, then Mr. Coliniatis will immediately perceive Mr. Sfouggatakis' letter to you as announcing the loss of the $500,000 Mr. Coliniatis anticipated receiving, of which $280,000 would be in hand any day now from the brokerage commissions. While prudence would require him to mask his true reaction, there will undoubtedly be hell to pay. I imagine that Mr. Coliniatis will surmise my involvement in this and will take prompt steps to fire my firm, if only to be free of our scrutiny in connection with the oncoming construction phase of the project.

Should it come to such a pass, we are prepared to lose Olympic as a client in order to protect Olympic's interests as a client. We are also, however, prepared to protect our reputation for honesty and integrity at any cost.

This is the second sad occasion where we have found ourselves to have unearthed an internal Olympic scandal of monumental proportions. The first occasion, some five years ago, involved an attempt by some Olympic insiders to use their position to shake down TWA for $800,000 a year. At our own expense, we investigated that information and confirmed it. We were able to prevent and contain the scandal. We neither sought nor accepted any payment from Olympic or TWA in this connection. Our reward was the satisfaction of successfully protecting the client I love most because for me it is Greece. The problem was solved, and no word leaked out. You may not even know of this incident. I enclose the investigative report we prepared in 1988.

Now we have been advised of an even more damaging scheme. One supposedly being attempted under our very noses. We do not yet know whether the charge is true. We do know that if true, the wrong must be righted. We seek, finally, the same satisfaction as before: the preservation of honor and integrity, yours and ours.

With best regards.

Sincerely,

(s) SC Dimas

Simos C. Dimas